EPSTEIN BECKER & GREEN, P.C.
Allen B. Roberts
Jessica Giambrone Palmese
875 Third Avenue
New York, NY 10022
Tel: 212.351.4500
Fax: 212.878.8600
ARoberts@ebglaw.com
JPalmese@ebglaw.com

*Attorneys for Defendants*
*Levi & Korsinsky, LLP, Eduard Korsinsky and Joseph Levi*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMY MILLER,                                    :    Case: 1:20-cv-01390-LAP-
                          Plaintiff,           :    BCM
                                               :
            - against -                        :
                                               :
                                               :
LEVI & KORSINSKY, LLP, EDUARD                  :
KORSINSKY, and JOSEPH LEVI,                    :
                                               :
                          Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL
FACTS SUBMITTED BY DEFENDANTS LEVI & KORSINSKY, LLP,
EDUARD KORSINSKY AND JOSEPH LEVI IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Levi & Korsinsky, LLP ("L&K"), Eduard Korsinsky

("Korsinsky") and Joseph Levi ("Levi"), by their attorneys Epstein Becker & Green,

P.C., pursuant to Rule 56.1 of the Local Civil Rules of the United States District

Court for the Southern and Eastern Districts of New York, respectfully submit that the following material facts are undisputed and support the grant of summary judgment in favor of Defendants:

**A.   The Parties and the Commencement of Plaintiff's Employment with L&K**

1.     L&K is a law firm primarily engaged in the practice in the areas of securities and derivative litigation.  Plaintiff's Amended Complaint (Dkt. No. 79) ("Am. Compl.") ¶ 16[1], Roberts Decl. Ex. 1.

2.     All of L&K's fees in its derivative practice are contingency based, and L&K receives no fee unless there is a successful court decision, settlement or negotiation.  Deposition Transcript of Amy Miller January 24, 2022 ("Pl. Tr.") 39:2-14, Roberts Decl. Ex. 2.

3.     As the founding and managing partners of L&K, Levi and Korsinsky had sole and exclusive responsibility for, and made, personnel decisions in the New York office of Defendant L&K, including the decisions to promote an attorney to partner; determine compensation structures for partners; pay Plaintiff equal salary for equal work; grant bonuses to employees; assign and reassign cases and terminate employees.  Am. Compl. ¶ 22, Roberts Decl. Ex. 1.

---

[1] References to exhibits attached to the Roberts Declaration are designated as "(Roberts Decl. Ex. _)."

4.      In or around spring of 2011, Plaintiff approached L&K through a search firm to interview for an Of Counsel position.  Pl. Tr. 59:6-10; May 27, 2011 email from recruiter L&K 000171, Roberts Decl. Exs. 1 and 5.

5.      Following their interviews with Plaintiff, Levi and Korsinsky extended an employment offer with an annual salary of $250,000. June 16, 2011 offer letter L&K 000117, Roberts Decl. Ex 6.

6.       L&K gave Plaintiff a written employment offer in 2011, providing that she would be "eligible for discretionary performance-based bonuses of up to 10 percent of the net annual legal fees generated to the firm above $2,500,000 for all cases for which [she was] assigned primary responsibility."  June 16, 2011 offer letter L&K 000117; Pl. Tr. 61:14-62:2; 157:21-158-8. Roberts Decl. Exs. 2 and 6.

7.      The June 16, 2011 offer letter expressly stated that Plaintiff's employment, should she accept the offer, would be at will.  June 16, 2011 offer letter L&K 000117.   Roberts Decl. Ex. 7.

8.      During L&K's recruitment of Plaintiff, Korsinsky was the primary point of contact with Plaintiff, and virtually all communications with Plaintiff and L&K were through Korsinsky.  L&K 000171; L&K 000181-000183.  Roberts Decl. Exs. 5 and 7.

9.     On June 21, 2011, Plaintiff disclosed to Korsinsky via the search firm that she was pregnant and scheduled to deliver in early 2012.  June 21, 2011 email from Gary Weiss to Korsinsky L&K 000184-85, Roberts Decl. Ex. 8.

10.    Believing that Plaintiff possessed the skills, knowledge and qualities to be a strong asset at L&K, Defendants continued to recruit Plaintiff and engaged in discussions with her about their benefits, health insurance and parental leave.  L&K 000188 – L&K 000210. Roberts Decl. Ex. 9.

11.    Plaintiff, however, rejected L&K's offer of employment, explaining that she thought it best to remain at her current law firm, Bernstein Litowitz Berger & Grossmann LLP ("BLBG"), until the end of her pregnancy. June 29, 2011 email from Gary Weiss to Korsinsky L&K 000207; Pl. Tr. 64:9-65:2. Roberts Decl. Exs. 2 and 10.

12.    Nevertheless, Plaintiff's recruiter wrote to Korsinsky, informing him that Plaintiff remained extremely enthusiastic about joining L&K in the future. June 29, 2011 email from Gary Weiss to Korsinsky L&K 000207. Roberts Decl. Ex. 10

13.    In October 2011, Plaintiff continued to express her interest in joining L&K and informed Korsinsky that she would contact him over the following summer, while on parental leave, to resume their conversations regarding her joining L&K.  October 16, 2011 email from Plaintiff to Korsinsky L&K 000122-24 at 000123. Roberts Decl. Ex. 11

14.     Knowing that Plaintiff would return to work after her second child was born, Korsinsky emailed Plaintiff on October 25, 2011 stating, "I also continue to believe that there is a place for you here and that we could use someone with your talent."  October 25, 2011 email from Korsinsky to Plaintiff L&K 000122-000124 at 000122; Korsinsky Decl. at ¶ 3.  Roberts Decl. Ex. 11.

15.     Although Plaintiff had told Korsinsky that she would reach out to him during the summer of 2012, Korsinsky did not receive anything more from Plaintiff for more than four years, when Plaintiff emailed Korsinsky on June 13, 2016 to revive discussion of her joining L&K.   June 13, 2016 email from Plaintiff to Korsinsky. L&K 000121. Roberts Decl. Ex. 12.

16.     Plaintiff explained to Korsinsky that she had not reached out to him in 2012, as she had said she would, because her then law firm, BLBG, had promoted her to "Senior Counsel," which led her to believe additional potential existed at BLBG.  June 13, 2016 email from Plaintiff to Korsinsky L&K 000121.  *Id.*

17.     Plaintiff informed Korsinsky that while she had explored the possibility of transitioning to an in-house counsel or corporate secretary position, she decided that she really wanted to commit herself to a legal career as a litigator and subsequently moved to Grant & Eisenhofer, P.A. ("G&E"), where she also held the title of "Senior Counsel."   June 13, 2016 email from Plaintiff to Korsinsky L&K 000121. *Id.*

5

18.     Plaintiff informed Korsinsky that she was unhappy at G&E because she believed that her talent and skills were not being utilized to their full potential.  June 13, 2016 email from Plaintiff to Korsinsky L&K 000121. *Id.*

19.     Plaintiff noted that L&K would be an excellent fit for her as she wanted to "take [her] career to the next level."  June 13, 2016 email from Plaintiff to Korsinsky L&K 000121. *Id.*

20.     Although Plaintiff had sound academic credentials and gained experience in litigating sophisticated business disputes, stockholder class actions and derivative lawsuits, she did not attain partner status at the law firm where she remained for several years after completing law school in 2001 or either of two law firms where she worked from 2009 through 2016.  Am. Compl. ¶¶ 26-33.  Roberts Decl. Ex. 1.

████████████████████████████████████████████████████████

████████████████████████████████████████████

23.     At the time of her hire, and throughout her employment, Plaintiff had the highest annual base salary of all the attorneys employed by L&K.  Pl. Tr. 67:7-17; 159:8-10; Deposition Transcript of Joseph Levi January 27, 2022 ("Levi Tr."), 214:6-8. Roberts Decl. Exs. 2 and 3.

24.     Plaintiff accepted the offer, sending an email on July 6, 2016, confirming her understanding of the offer's terms, which included partnership consideration, an annual base salary of $285,000 and "[d]iscretionary bonuses TBD based on my performance and the firm's performance."   L&K 000134.   Roberts Decl. Ex. 15.

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

27.     Plaintiff was "very excited to join L&K in 2016" and "thought it was a great opportunity."  Pl. Tr. 160:10-13. Roberts Decl. Ex. 2.

28.    On August 15, 2016, Plaintiff commenced employment at L&K in the position "Of Counsel" in L&K's derivative litigation practice.   L&K 000147-000148. Roberts Decl. Ex. 19.

29.    Plaintiff did not have any employment contract with any of the Defendants with respect to her employment, compensation or annual vacation days. Plaintiff's Responses to the Pilot Discovery Protocols for Counseled Employment Cases, Response to Request No. 1(a) (May 7, 2021); Pl. Tr. 203:5-6. Roberts Decl. Ex. 2 and 20.

30.    Svetlana Mayzus ("Mayzus") was hired by L&K in 2016 as Office Manager.  Korsinsky Tr.86:15-89:11; Employee Handbook in effect as of September 1, 2018, L&K 000072. Roberts Decl. Ex. 4

31.    Mayzus was known to Plaintiff as an office administrator, responsible for employee pay and benefits, HR and paralegals, but having no authority for supervising L&K attorneys.  Pl. Tr. 175:25-176:10. Roberts Decl. Exs. 2 and 20.

**B.  L&K's Handbook Provisions**

32.    On August 15, 2016, Plaintiff acknowledged receipt of a copy of L&K's Employee Handbook and agreed to read it and abide by its terms. Employee Handbook Acknowledgment signed by Plaintiff August 15, 2016. L&K 000003. Roberts Decl. Ex. 22.

33.    The Employee Handbook states that it "does not constitute an express or implied employment contract, nor does it establish any guarantee of employment." Employee Handbook in effect as of July 8, 2014. L&K 000033; Employee Handbook in effect as of September 1, 2018, L&K 000072. Roberts Decl. Ex 21.

34.    The Employee Handbook states that, "Any and all benefits, policies, and procedures set forth herein are statements of general Firm policy and shall, in no manner, be construed to imply a contract or a guarantee of continuing employment with the Firm or employment for any specific length of time." Employee Handbook in effect as of July 8, 2014, L&K 000033; Employee Handbook in effect as of September 1, 2018, L&K 000072. Roberts Decl. Exs 21 and 23.

35.    The Employee Handbook states that all employees of L&K are "employed at will." Employee Handbook in effect as of July 8, 2014. L&K 000042; Employee Handbook in effect as of September 1, 2018, L&K 000088. Roberts Decl. Exs. 24-25.

36.    The Employee Handbook states in the section titled "Bonus Policy – All Bonuses are Non-Contractual" that:

> "[i]t is the Firm's policy that any and all bonuses are never contractual and determined and paid solely at the discretion of the Firm's Managing Partners. Employees should never assume or expect that they will receive any

> bonus, regardless of any oral representation made otherwise. Modification to the Firm's discretionary bonus policy can only be made in writing and signed by either of the Managing Partners. The Firm's bonus policy does not change regardless of how consistently or inconsistently it is applied in practice.

Employee Handbook in effect as of July 8, 2014, L&K 000036; Employee Handbook in effect as of September 1, 2018, L&K 000075.  Roberts Decl. Exs. 26-27.

37.   L&K "has an unequivocal policy of equal employment opportunity" where "all employees are treated without regard to their race, religion, gender, color, ethnicity, national origin, age, disability, pregnancy, sexual orientation, gender identity and/or expression, marital status, citizenship, veteran or military status, or local law."   Employee Handbook in effect as of July 8, 2014, L&K 000043; Employee Handbook in effect as of September 1, 2018, L&K 000089. Robert Decl. Exs. 30-31.

38.   L&K prohibits discrimination and harassment, including sexual harassment, regarding one's employment, including "job assignment, promotion, …termination of employment, … rates of pay or other forms of compensation," based on any "characteristic protected by applicable law," including one's "race, religion, gender, color, ethnicity, national origin, age, disability, pregnancy, sexual orientation, gender identity and/or expression, marital status, citizenship, veteran or military status, or local law."  Employee Handbook in effect as of July 8, 2014, L&K

000043, 000047; Employee Handbook in effect as of September 1, 2018, L&K 000089-90.  Roberts Decl. Exs. 30-33.

39.     At L&K "all other personnel matters such as compensation, benefits, transfer, layoffs, recall from layoffs, training, education, social, and recreational programs are administered without regard to race, religion, gender, color, ethnicity, national origin, age, disability, pregnancy, sexual orientation, gender identity and/or expression, marital status, citizenship, veteran or military status, or any other criteria that would be a violation of any applicable federal, state, or local law."  Employee Handbook in effect as of July 8, 2014, L&K 000043; Employee Handbook in effect as of September 1, 2018, L&K 000089.  Roberts Decl. Exs. 30-31.

40.     L&K provides both an informal and formal complaint procedure through which individuals who believe they have been subject to discrimination or harassment:

> E. Complaint Procedure
>
> Each employee of the Firm is responsible for creating and fostering an atmosphere free of discrimination and harassment. This is best accomplished when all employees assume responsibility for respecting the rights of their co-workers and ensuring that others conduct themselves in a similarly respectful manner. To facilitate the achievement of this goal, the Firm provides two means of pursuing complaints of offensive work-related conduct. This policy applies to offensive conduct inside the workplace or outside the workplace where the activities are work-related or involve co-workers or others with whom employees

11

come into contact in connection with their work. The two methods for complaint are: (1) an informal complaint procedure and (2) a formal complaint procedure. These provisions should not be construed as a requirement that a complaining party pursue the informal procedure prior to commencing a formal complaint proceeding. There is no such requirement.

Employee Handbook in effect as of July 8, 2014, L&K 000043-000044;

Employee Handbook in effect as of September 1, 2018, L&K 000091-000092.

Roberts Decl. Exs. 30, 32, 33.

41.    An employee with a complaint regarding harassment or discrimination may choose to have it addressed informally:

*1. Informal Procedure*
The Firm encourages people who believe they are being harassed or discriminated against to clearly and promptly notify the offender that his or her behavior is unwelcome or objectionable. If, however, for any reason, a person does not wish to confront the offender directly or if such confrontation does not successfully and satisfactorily resolve the matter, the complaining party may notify a Managing Partner or supervisor who, if requested, may talk to the alleged offending party on the complaining person's behalf.

There may be instances in which a person seeks to discuss matters only with Mr. Levi or with Mr. Korsinsky or with another partner of the Firm. A person reporting harassment or discrimination should be aware, however, that Mr. Levi or Mr. Korsinsky or the other Firm partner may deem it necessary to take action to address the harassment or discrimination beyond an informal discussion with the complaining party. The best course of action will depend on many

factors. Therefore, the informal procedure must remain flexible.

42.    If a complaint regarding harassment or discrimination involves either Levi or Korsinsky an individual may go to the Managing Partner not involved with the complaint; if a complaint involves both Levi and Korsinsky, the individual may direct their complaint to L&K Partner Shannon Hopkins:

> *2. Formal Procedure*
> In the event that the reporting person does not wish to pursue the informal procedure outlined above, or in the event that the informal procedure does not produce a result satisfactory to the reporting person, the following steps should be taken to formally report the harassment or discrimination.
>
> If an employee experiences any job-related harassment or discrimination by anyone at the Firm or by any third party (including clients, visitors, or the like), he or she should promptly report the incident in writing to Mr. Levi. The writing need only be sufficiently detailed to afford Mr. Levi reasonable notice of the general nature of the conduct in question and the identity of the person(s) allegedly involved. Mr. Levi or his designee will investigate the matter and take appropriate and reasonably prompt action. If the employee's complaint involves Mr. Levi, the written complaint should be forwarded to Mr. Korsinsky, who will investigate the matter and take appropriate action. Any manager or supervisor becoming aware of harassment or discrimination in the workplace must report it immediately to Mr. Levi in accordance with these provisions or, if the complaint involves Mr. Levi, to Mr. Korsinsky. If the complaint involves both Managing Partners, you may direct your complaint to Shannon Hopkins.

Employee Handbook in effect as of July 8, 2014, L&K 000044; Employee Handbook in effect as of September 1, 2018, L&K 000092. *Id*.

43.    L&K's Handbook treats retaliation separately from discrimination and harassment:

> *7. Protection Against Retaliation*
>
> The Firm absolutely prohibits any form of retaliation against any employee who makes a good-faith complaint under this policy, assists in a complaint investigation, or who makes any determination necessary under this policy. Any such retaliation is a serious violation of this policy and should be reported immediately to Mr. Levi or Mr. Korsinsky. It will not be tolerated.
>
> Any person found to have so retaliated against another will be subject to appropriate disciplinary action, up to and including termination of employment.

Employee Handbook in effect as of July 8, 2014, L&K 000045; Employee Handbook in effect as of September 1, 2018, L&K 000093.  Roberts Decl. Ex. 34.

44.    L&K's informal and formal procedure regarding harassment and discrimination was the same in its 2014 Handbook and its 2018 Handbook.  Roberts Decl. Exs. 30-36.

45.    L&K's procedure regarding retaliation was the same in its 2014 Handbook and its 2018 Handbook. *Id*.

46.     L&K "advances, promotes and transfers employees on the basis of such things as ability, achievement, and need."  Employee Handbook in effect as of July 8, 2014, L&K 000047; Employee Handbook in effect as of September 1, 2018, L&K 000095.  Roberts Decl. Exs. 30 and 35.

47.     L&K "Employees are prohibited from having any form of recording or photography device in the workplace (except for cell phones with recording and photographic capabilities and personal cameras/video-cameras and the like) and from recording or photographing fellow employees in the workplace or during working time.  Violations of this policy may result in discipline (including the possibility of termination of employment), immediate removal of the recording device and/or the employee from the workplace, and retention of the recording device for inspection by the practice and/or legal authorities.…"  Employee Handbook in effect as of July 8, 2014, L&K 000062; Employee Handbook in effect as of September 1, 2018, L&K 000113. Roberts Decl. Ex. 36

48.     L&K provides attorneys admitted to practice for more than four years fifteen working days of vacation time per calendar year, which must be taken during the given calendar year in which it accrues.  "Employees will not be given vacation pay in lieu of vacation time off." Employee Handbook in effect as of July 8, 2014, L&K 000034; Employee Handbook in effect as of September 1, 2018, L&K 000073. Roberts Decl. Ex. 37.

49.     In addition to her annual salary, Plaintiff, like all other attorneys at L&K, was eligible for consideration of an annual bonus. Employee Handbook in effect as of July 8, 2014, L&K 000036; Employee Handbook in effect as of September 1, 2018, L&K 000075; L&K 000134. Roberts Decl. Ex. 38.

50.     Per L&K's Employee Handbook, "all bonuses are never contractual and determined and paid solely at the discretion of the Firm's Managing Partners" and employees "should never assume or expect that they will receive any bonus, regardless of any oral representation made otherwise."  Employee Handbook in effect as of July 8, 2014, L&K 000036; Employee Handbook in effect as of September 1, 2018, L&K 000075. *Id*.

51.     Employees are advised that "[m]odification to the Firm's discretionary bonus policy can only be made in writing and signed by either of the Managing Partners."  Employee Handbook in effect as of July 8, 2014, L&K 000036; Employee Handbook in effect as of September 1, 2018, L&K 000075. *Id.*

## C.  L&K's Investment in Plaintiff's Professional Growth and Plaintiff's Expressed Happiness with Working at L&K

52.     Plaintiff was an at-will employee and worked from L&K's New York City office.   Employee Handbook in effect as of July 8, 2014, L&K 000042; Employee Handbook in effect as of September 1, 2018, L&K 000088; Levi Tr. 170:20-21. Roberts Decl. Exs. 3, 26, 39.

53.     After commencing employment with L&K, Plaintiff was "extremely happy" and "telling everyone how much [she] loved L&K."  Pl. Tr. 137:11-12; 226:23-24.  Roberts Decl. Ex. 2.

54.     In late July 2017, Plaintiff continued to share with others her happiness at L&K.  By email dated July 25, 2017, Plaintiff informed Jonathan Kass of the law firm Lowenstein Sandler that she was not interested in interviewing for a position at Lowenstein Sandler because she was "too happy at L&K to waste either of our time to come in for an interview."  PLF ESI 0000523.  Plaintiff went on to state that she thought "things [were] going really well at L&K, and [she couldn't] see [herself] making a change unless it was a ridiculous raise in compensation for a job that [she] thought would be as at least as interesting as what [she was] doing right now."  *Id.*

[2] "Plaintiff's Production" refers to her document production separate from her ESI production.

17

███████████████████████████████████████████████

████████████████████████████

57.     During the entirety of her career at L&K, Plaintiff was given opportunities to present oral arguments that she "would never have gotten to do at Grant & Eisenhofer or Bernstein Litowitz."  Mar. 28, 2019, Audio Tr. 31:23-32:5. Roberts Decl. Ex. 44.

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

### D.   L&K's Support for Female Attorneys with Familial and Caregiver Responsibilities

59.     Shannon Hopkins ("Hopkins") joined L&K in April of 2010 as an Associate and became a Partner in February of 2011.  Deposition Transcript of Shannon Hopkins April 4, 2022 ("Hopkins Tr.") 41:24-25, 43:13-14. Roberts Decl. Ex. 46.

60.     As a Partner in 2011 Hopkins' base salary was approximately $165,000.00 a year.  Hopkins Tr. 44:8-14. *Id*.

61.     When she first joined L&K as an Associate, Hopkins was a single mother of a young child, commuting from her home in Connecticut to L&K's offices in downtown Manhattan.  Hopkins Tr. 58:2-5. *Id*.

62.    Hopkins informed Levi that she had received an offer from another firm that would reduce her commuting and allow her to better balance her professional and caregiving responsibilities as a single mother of a young son.  Hopkins Tr. 58:1-59:14; Levi Tr. 315:15-316:22. Roberts Decl. Exs. 3 and 44.

63.    Upon learning from Hopkins that she was considering leaving L&K because of the burden of commuting and family caregiving responsibilities, L&K agreed to rent office space in Stamford, Connecticut for Hopkins's use.  Hopkins Tr. 58:14-19.  Roberts Decl. Ex. 44.

64.    Hopkins gave birth to a second child in 2015.  Hopkins Tr. 96:15-23. *Id*.

65.    With L&K's support, Hopkins has developed a successful and thriving practice in the Stamford office, where she went from being the sole attorney to the managing partner, with twelve direct reports. Levi Tr. 315:4-8. Roberts Decl. Ex. 3.

**E.    The December 2017 Designation of Plaintiff and a Comparable Male Attorney as Partner**

66.    In or around the late fall of 2017, Levi and Korsinsky decided to promote longtime L&K Associate Adam Apton ("Apton") to the title of Partner. Levi Tr. 135:23-136:8; Korsinsky Tr. 232:19-233:14. Roberts Decl. Exs. 3 and 4.

67.    Levi and Korsinsky wanted to reward Apton for his contributions to L&K and also help increase his standing professionally among his peers and when

appearing before the court on behalf of L&K clients.   Levi Tr. 135:23-136:8.
Roberts Decl. Ex. 3.

68.   Apton's change of title to Partner did not result in a change to his
eligibility for fee-based bonuses under L&K's compensation structure.   Levi Tr.
135:11-20. *Id*.

69.   In December 2017, Levi and Korsinsky decided to encourage and
support Plaintiff professionally by also giving her the title and standing of Partner,
something she never attained at any prior or subsequent firm.   Levi Tr. 135:21-138:9;
Korsinsky    Tr.    223:6-9;    Plaintiff's    Resume    L&K    000007-000008;
https://www.cohenmilstein.com/professional/amy-miller.    Roberts Decl. Ex. 3, 4,
45.

70.   Although Plaintiff had not generated any meaningful fees or profits for
L&K as of December 2017, Levi and Korsinsky decided to change Plaintiff's title
to Partner in order to increase her professional standing, and growth potential, with
other members of the bar with whom she regularly interacted.   Levi Tr. 137:7-24;
Korsinsky Tr. 220:20-24, 221:5-24, 223:6-9.   Roberts Decl. Ex. 3 and 4.

71.   As with Apton, L&K did not alter the terms of Plaintiff's compensation
when her title changed to Partner, and Plaintiff's compensation structure remained
an annual salary of $285,000 with the opportunity to receive an annual discretionary
bonus.   Korsinsky Tr. 260:7-11. Roberts Decl. Ex. 4.

72.    On January 19, 2018, L&K announced in a firm-wide email that Plaintiff and Apton had each been given the title of Partner.  L&K 010094. Roberts Decl. Ex. 46.

**F.    Plaintiff's Requested Changes to Her Compensation Structure that Were Inconsistent with the Compensation of Comparable Employees**

73.    Prior to and during the time period of Plaintiff's employment at L&K, L&K had offered select senior attorneys, who were accomplished and had attained established track records of generating fees in prior law firms, fee-based commissions when they joined L&K.  Levi Tr. 74:13-20.  Roberts Decl. Ex. 3.

74.    After vetting Donald Enright ("Enright"), Nicholas Porritt ("Porritt"), Lori Feldman ("Feldman"), and Rosemary Rivas ("Rivas"), who had been established partners at their previous firms and had demonstrated abilities to generate fees as rainmakers, L&K hired them as partners, with arrangements for sharing their fee generation, without a stated fee-generation threshold.  Levi Tr. 74:13-20. *Id*.

75.    Enright had been a successful M&A attorney and partner at Finkelstein & Thompson for many years; Porritt was a successful partner at Wilson Sonsini and Akin Gump; Feldman had been a partner for many years already; and Rivas was a partner who had created a docket that generated millions of dollars a year in fees. Levi Tr. 74:9-75:11, 76:18-77:3, Levi Decl. at ¶¶4-5.  *Id*.

76.     L&K's offer letters set forth terms of fee-based bonuses, without a stated fee-generation threshold, for to two male attorneys, Enright (L&K 01068 (February 23, 2011)) and Porritt (L&K 01069-70 (December 15, 2011)) and two female attorneys Feldman (L&K 01071-74 (December 29, 2015)) and Rivas (L&K 01092-93) (January 20, 2017)).  Roberts Decl. Ex. 49.

77.     For other, less-experienced junior attorneys who first became partners during their L&K employment, such as Plaintiff, L&K required achievement of positive financial results – generating $2.5 million in fees in one year – before they could become entitled to fee-based bonuses.  Levi Tr. 75:15-77:9. Roberts Decl. Ex. 3.

78.     L&K's $2.5 million threshold requirement was applied to both male and female attorneys.  Levi Tr. 75:15-77:9. *Id*.

79.     Unlike attorneys having an established record of successful fee generation as partners at other firms prior to joining L&K, all other male and female attorneys hired by L&K were subject to the common standard of establishing their capacity for fee generation.  Levi Tr. 77:4-6. *Id*.

80.     Like Plaintiff and Apton, Shane Rowley ("Rowley"), both male, and Hopkins, a female, had been subjected to the same requirement of establishing fee generation capabilities before being awarded fee-based bonuses.  Levi Tr. 77:4-9. *Id*.

81.     Once an L&K attorney qualified for a share of fee generation, L&K continued to monitor profitability but did not discontinue the attorney's fee sharing simply because the attorney had an unsuccessful year.  Levi Tr. 74:24-75:11. *Id*.

82.     At the time of hire, Plaintiff did not have, or purport to have, any established history of fee generation.  Plaintiff Resume 00001. Roberts Decl. Ex. 50.

83.      The compensation arrangement applicable to Plaintiff at the time of hire was not comparable to the arrangements of Rivas, Feldman, Enright and Porritt. Roberts Decl. Ex. 15, 18, 49.

84.     The compensation arrangement applicable to Apton, Rowley and Hopkins at the time of hire was not comparable to the arrangements of Rivas, Feldman, Enright or Porritt.  Levi Dep. 77:4-9.  Roberts Decl. Ex. 49.

85.     The compensation arrangement applicable to Plaintiff after being given the title of Partner was comparable to the arrangement of Apton and Hopkins when each became Partner. *Id*.

86.     At the time they were given the title of Partner, neither Plaintiff nor Apton received fee-based bonuses from L&K because they had not attained L&K's fee generation threshold of $2.5 million.  Levi Dep. 135:14-20.

87.     Plaintiff was aware of L&K's $2.5 million fee threshold from the time she had originally received an offer from L&K in 2011.  P 000045; Pl. Tr. 180:18-20. Roberts Decl. Ex. 2 and 49.



90.    The compensation arrangements of other L&K attorneys were never disclosed to the Plaintiff while she was employed there.  Pl. Tr. 316:2-9.  Roberts Decl. Ex. 2.

### G.    Plaintiff's Awareness that Her Fee Generation Did Not Qualify for Fee Sharing

91.    During her tenure at L&K, Plaintiff worked exclusively in the firm's New York City derivative practice.  Levi Dep. 130:21-25.  Roberts Decl. Ex. 3.

92.    The annual fee generation of L&K's entire New York City derivative practice never exceeded "approximately $2 million" in 2018 or any other year Plaintiff was employed by L&K. Am. Compl. ¶ 87; Plaintiff's March 28, 2019 Audio Recording Tr. 15:14-15; Levi Decl. at ¶ 9



████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

96.     Plaintiff had "the steady salary" in her family and hoped to be "the primary breadwinner" for her family "by making lots of money."  Pl. Tr. 121:6-13. Roberts Decl. Ex. 2.

97.     In an April 12, 2018, email to Plaintiff concerning a chart she had prepared showing a range of fee potential for her current cases, Korsinsky commented

that while the chart was acceptable, "it shows that we need to fill that pipeline with more quality cases." L&K 009880.

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

103.   During Plaintiff's review in December 2018, Levi told her that he would consider paying her on a "case-by-case" basis going forward. Mar. 28, 2019, Audio Tr. 23:7-25, Roberts Decl. Ex. 42.

104.   On January 8, 2019, during a conversation Plaintiff secretly recorded, Korsinsky encouraged and coached Plaintiff with respect to building a profitable docket by focusing her attention on high level matters rather than "small little cases" and properly staffing cases more economically by utilizing lower paid junior attorneys so Plaintiff could perform "higher level" work that is more profitable to Plaintiff and L&K to maximize potential fees for her own benefit and the benefit of L&K.  Jan. 8, 2019 Audio Tr. 4:14-20, 6:5-7-20, 8:8-18, 10:6-17, 11:2-12:14, 28:9-17.  Roberts Decl. Ex. 58.

105.   On January 8, 2019, Korsinsky discussed with Plaintiff losses incurred by L&K because of cases on which she and other L&K attorneys invest time that are worthless or have negative value to L&K and her discussion with Levi about profitability of her cases in 2018.  Jan. 8, 2019, Audio Tr. 4:20:6:25, 10:10-12. *Id*.

106.   On January 8, 2019, Korsinsky told Plaintiff that prospectively she needed to do things differently to have a more valuable docket.  Jan. 8, 2019, Audio Tr. 7:22-12, 8:12-24. *Id*.

107.   On March 4, 2019, Korsinsky proposed an agreement with Plaintiff whereby she would receive 10% of fees L&K generated from claims filing for Amalgamated Bank.  March 4, 2019, Audio Tr. 15:10-17. Roberts Decl. Ex. 59.

109.   Korsinsky had known for several months prior to offering Plaintiff 10% of Amalgamated Bank claims filing fees that Plaintiff was actively searching for another job and that she would attempt to take Amalgamated Bank and its McKesson case to her new firm.  Korsinsky Decl. at ¶ 9.

110.   Korsinsky's belief that Plaintiff intended leaving L&K, with an expectation of taking Amalgamated Bank was reinforced when Plaintiff did not

accept Korsinsky's offer of a share of claims fees generated by Amalgamated Bank or propose other terms.  Korsinsky Decl. at ¶ 9-10.

**H.   Plaintiff Lacked Timely and Accurate Knowledge of the Fee Generation and Compensation Considerations of Other L&K Employees**

111.   Plaintiff's total compensation from L&K was $134,886 for the partial year 2016, $328,549 for 2017, and $313,105 for 2018.  L&K10287.  Roberts Decl. Ex. 61.

112.   Plaintiff did not know the amounts of fees generated by other L&K attorneys, or the corresponding expenses, such as payroll expenses, the salaries, the taxes, the health insurance, office overhead, the cost of running the offices, the office administrators, the rent, the marketing, or the technology.  Pl. Tr. 81:10-82:22; 83:5-7. Roberts Decl. Ex. 2.

113.   Plaintiff did not know the terms on which Enright or Porritt were employed or the profitability of their cases. Pl. Tr. 74:4-15; 76:24-81:9; 173:4-174:23; 178:17-22. Roberts Decl. Ex. 2.

114.   Plaintiff did not know the employment terms of any female attorneys employed by L&K. Pl. Tr.  73:16-23. Roberts Decl. Ex. 2.

115.   Plaintiff has no knowledge of highly profitable years by Enright or Porritt relative to the compensation either of those attorneys received in in any year.  Pl. Tr. 82:16-83:10. Roberts Decl. Ex. 2.

116.   Plaintiff asserts that Enright and Porritt are her alleged comparators. Am. Compl. ¶¶ 40, 44, 61. Roberts Decl. Ex. 1.

117.   Plaintiff did not generate fees for L&K comparable Enright and Porritt. Levi Tr. 74:9-77:9; Levi Decl. at ¶¶ 6-8, Exhibit 1-3.

118.   Plaintiff pleads entitlement to a 15% commission on any fee earned from L&K's "Derivative Department" cases.  Am. Compl. ¶ 67.  Roberts Decl. Ex. 1.

119.   Plaintiff was not aware of any L&K attorney – male or female – receiving a 15% share of fees generated.  Pl. Tr. 315:18-16:9. Roberts Decl. Ex. 2.

120.   Of the four L&K Partners who received a share of fees generated for L&K, Enright, Porritt, Feldman and Rivas, only Feldman received as much as 15% for certain matters.  L&K 01071-74.  Roberts Decl. Ex. 47.

121.   Plaintiff did not expect L&K to agree to her request for 15% commission on any fee earned from L&K's New York derivative practice cases and considered that formula only a basis for a "negotiation."  Pl. Tr. 316:2-24. Roberts Decl. Ex. 2.

122.   Although in May 2018 Plaintiff expected a "negotiation" about her proposal for an immediate percentage share of fees she generated, she was "disappointed" when she was told to focus on her work to reach L&K's $2.5 million threshold.  Pl. Tr. 316:15-317:22. Roberts Decl. Ex. 2.

123.   Plaintiff did not present to Korsinsky any documents concerning "her proposal for her Partner compensation" of "15% commission on any fee earned from the NY Derivative Department cases, and a 10% commission for any fee earned by L&K using any of Plaintiff's clients for cases not in her department," as alleged in Paragraph 66 of the Complaint and Amended Complaint.  Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 30, October 28, 2021; Plaintiff's Supplemental Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 30, December 22, 2021 (Dkt. No. 53-1); Plaintiff's Second Supplemental Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 30, February 4, 2022. Korsinsky Decl. ¶11. Roberts Decl. Ex. 63.

124.   Korsinsky did not receive from Plaintiff any documents concerning the allegation in Paragraph 66 of the Complaint that Plaintiff "presented Korsinsky with her proposal for her Partner compensation, which included a 15% commission on any fee earned from the NY Derivative Department cases, and a 10% commission for any fee earned by L&K using any of Plaintiff's clients for cases not in her department." Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 30, October 28, 2021; Plaintiff's Supplemental Responses and Objections to Defendants' First Request for the

Production of Documents, Response to Request No. 30, December 22, 2021 (Dkt. No. 53-1); Plaintiff's Second Supplemental Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 30, February 4, 2022; Korsinsky Decl. at Korsinsky Decl. ¶11.  *Id.*

125.   On May 17, 2018, Levi wrote to Korsinsky:

> My problem with Amy's ask is not that we will have to concede to her (we won't) but that she demonstrates a complete lack of judgment/awareness of our structure and her value and doesn't consider the ramifications of asking for too much. She should have started the conversation off by asking what comp structure does the firm give to partners. All you have to do is compare Adam [Apton] to Amy and you can see the difference. (And arguably Adam [Apton] will bring in more fees than Amy).  What is also troubling is that she is too soft and unsophisticated when in a position to wrestle fees from other firms but she is somehow able to take an aggressive position internally. Such lack of judgment will cost us on the front lines.

> In corporate America when someone may a "play" for a top spot and fails they don't go back to the original position and are forced to leave to avoid further conflict/dissatisfaction. Amy showed her hand as to what she thinks she is worth and based on that I don't ever see her happy with the structure that we are comfortable with. My guess is that it will be a matter of time before we part ways. I am okay with that because we have good people behind her.

L&K 001555; Levi Tr. 13:19-14:23.  Roberts Decl. Ex. 4 & 64.

126.   On May 18, 2018, Levi wrote to Korsinsky:

> I don't know if you had a conversation with Amy on comp, but I would suggest simply telling her that we have a comp

structure in place for partners that kicks in when they achieve a threshold of $2.5m in fees per year. (Below that it makes no sense for us to give a salary plus a piece). She will not get better than Don/Nick etc. In fact, she will end up with a more expensive team so we may consider tying that in.  Once again I am amazed at her chutzpa. If she doesn't earn another nickel in fees this year, she expect her $285k salary plus 15% of Fox (150k) for a total comp of 435k which is essentially 40% of the fees she brought in without considering all the salaries supporting her.  Just appalling.

L&K 001557; Levi Tr. 10:25-13:18. Roberts Decl. Ex. 4 and 65.


I.   **Fees and Compensation of Comparators Identified by Plaintiff**

     a.  **Donald Enright**

127.   By terms of his February 23, 2011 offer letter, Enright's annual compensation was $250,000 and 12% of the net legal fees earned by him in any case for which he was the sole senior responsible attorney or a pro rata portion of such 12% if any other senior attorney also worked on the case.  L&K 010068. Roberts Decl. Ex. 66.

128.   In 2017, Enright generated fees for L&K in the amount of $9,102,459.92.  L&K 010206. Roberts Decl. Ex. 67.

129.   In 2018, Enright generated legal fees for L&K in the amount of $2,917,921.06.  L&K 010206. *Id*.


     b.  **Nicholas Porritt**

130.   Porritt's December 15, 2011 offer letter provided for: (i) 10% of net legal fees earned by L&K in any case for which he was the sole senior attorney; (ii) a pro-rata portion of such 10% if another senior attorney also worked on the case; (iii) an additional 5% of the net fee for any client he generated for the firm as well as for any proprietary litigation ideas.  L&K 010069-70. Roberts Decl. Ex. 49.

131.   In 2017 Porritt generated $4,596,285 in fees to L&K.  L&K 010199. Roberts Decl. Ex. 68.

132.   In 2018, Porritt generated $8,162,830 in attorney's fees for L&K. L&K 010199. *Id*.

### c. William Fields

133.   In 2017, William Fields ("Fields"), an Associate at L&K had received a salary of  $140,000 and he received a bonus of $30,000.  Levi Decl. at ¶ 10

134.   In 2018, Fields's salary was $150,000 and he received a bonus of $30,000.  Levi Decl. at ¶ 11.



136.   Levi considered Fields's salary a bit low and believed the bonus served as an incentive to stay with L&K and recognition of his efforts and generation of his own docket of cases.  Levi Tr. 308:20-309:12.  Roberts Decl. Ex. 3.

**J. Fee Generation of Plaintiff Relative to Enright and Porritt**

137.   In 2017 and 2018, cases in which Plaintiff participated generated fees to L&K of $1,816,815 ($319,724 in 2017, and $1,497,091 in 2018). ($1,035,256 in 2017, and $855,386 in 2018.  L&K 010287; Levi Decl. at ¶ 6, Exhibit 1, Roberts Decl. Ex. 61.

138.   In 2018, $1.1 million of the fees in cases in which Plaintiff participated was attributable to a case involving Fox News (the "Fox case").  Pl. Tr. 50:15-20, 105:20-22. Roberts Decl. Ex. 2.

139.   Levi and Korsinsky had expected Plaintiff to comply with Korsinsky's instruction to Plaintiff to settle the Fox case for $1.5 million, not $1.1 million. Korsinsky Tr. 317:5-22; 319:3-6; 324:5-25:2; 335:15-19; 336:10-15; 389:2-390:9; Levi Tr. 163:13-164:19; Korsinsky Decl. at ¶¶ 5-6.  Roberts Decl. Ex. 3 and 4.

140.   In 2017 and 2018, Enright generated fees to L&K of $12,020,380 ($9,102,459 in 2017, and $2,917,921 in 2018).L&K 010204; Levi Decl. at ¶ 7 , Exhibit #2.

141.   In 2017 and 2018, Porritt generated fees to L&K of $12,759115 ($4,596,285 in 2017, and $8,162,830 in 2018). L&K 10199; Levi Decl. at ¶ 8 #, Exhibit #3.

**K. Plaintiff's Actions Contrary to L&K's Interests**

142.   During the time Plaintiff worked at L&K only a single case on which she worked generated a significant fee recovery, a case involving  Fox News (the "Fox case").  Pl. Tr. 49:9-17, 50:15-20, 105:20-22. Roberts Decl. Ex. 2.

143.   Plaintiff considered the April 2018 fee of $1.1 million in the Fox News case, the "first big fee that was coming in" and the basis to "start getting bonuses" based on the work she was doing. Pl. Tr. 101:13-25, 105:17-23. Roberts Decl. Ex. 2.

144.   The Court had previously escrowed $1.5 million for the benefit of L&K in the Fox case.  Korsinsky Tr. 389:13-23. Roberts Decl. Ex. 4.

145.   Plaintiff knew that the Court had escrowed $1.5 million for the benefit of L&K in the Fox case.  Pl. Tr. 91:19-21. Roberts Decl. Ex. 2.

146.   Korsinsky instructed Plaintiff to settle the Fox case for $1.5 million. Korsinsky Tr. 317:8-22, 389:4-390:9; Korsinsky Decl. at ¶ 4.  Roberts Decl. Ex. 2.

████████████████████████████████████████████████████

████████████████████████████████████████████

148.   Plaintiff had written to her mother on March 22, 2018, that she would "call it a win" if the Fox case settled for more than $1.2 million, adding that she

didn't want to be fighting over the fees for another year and not get paid.  Further

stating, "I need to have these fees coming in in so I can actually start earning some

real additional money." PLF ESI 0000549. Roberts Decl. Ex. 70.

149.   Korsinsky was not available from sundown Thursday April 5 until after

sundown on Saturday April 7 because of his observance of the Passover holiday and

Sabbath.  Korsinsky Decl. at ¶ 5.

150.   Plaintiff was aware of Korsinsky's religious observance of Passover

and Sabbath.  Pl. Tr. 95:24-96:8. Roberts Decl. Ex. 2.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

152.   Notwithstanding Plaintiff's knowledge that $1.5 million had been

escrowed for L&K by the court, Korsinsky's instruction and expectation of $1.5

million in fees for L&K in the Fox case, Plaintiff's own belief that an amount less

than $1.2 million would not be called a "win" and Korsinsky's availability for

discussion as early as Saturday evening April 7/Sunday April 8, Plaintiff settled the

Fox case fee for $1.1 million without informing Korsinsky.  Pl. Tr. 110:9-18; Levi

Tr. 163:13-164:19; Korsinsky Tr., 389:9-389:25; Korsinsky Decl. at ¶ 5. Roberts Decl. Exs. 2, 3, 4.

[redacted]

[redacted]

[redacted]

156. Korsinsky considered Plaintiff's behavior and disagreements with him to be insubordinate and an attempt to undermine him. Korsinsky Tr. 318:5-7. Roberts Decl. Ex. 4.

157.   Plaintiff understood that if she and Korsinsky had a difference of opinion about a matter of interest to L&K, Korsinsky's opinion should prevail.  Pl. Tr. 112:11-18, 113:9-17.  Roberts Decl. Ex. 2.

158.   L&K relocated its New York offices to 55 Broadway in August 2018. Korsinsky Decl. at ¶ 12.

159.   In January 2019, Korsinsky decided to move Plaintiff's office from the room adjacent to his office so he could have a conference room and privacy where his conversations would not be overheard by Plaintiff.  Korsinsky Decl. at ¶ 13.

160.   Korsinsky selected an office for Plaintiff that measured 10' 9" x 14' 2" and which was directly adjacent to her initial office.  Korsinsky Decl. at ¶ 14.

161.   Plaintiff's previous office was 11' 6" x 14' 2" square feet.  Korsinsky Decl. at ¶ 14.

**L.   In August 2018, Plaintiff Commenced a Job Search**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

173. Although Levi and Korsinsky were aware since the fall of 2018 of Plaintiff's intended departure from L&K, they allowed her time to find new employment, even though this exposed L&K to the risk of keeping on an insubordinate employee who was considered an active threat with no current or

future loyalties to L&K.  Levi Tr. 112:7-113:18; 295:13-300:9; Korsinsky Tr. 288:4-18; 384:10-385-8. Roberts Decl. Exs. 3 and 4.

174.    When Levi informed Plaintiff in December 2018 that he knew she was looking for another, she denied that she was doing so.  Levi Tr. 295:14-296:15, 301:5-19. Roberts Decl. Ex. 3.



177.    On February 7, 2019, Plaintiff's employment search and solicitation of Amalgamated Bank had advanced to the point that Plaintiff sent an email to her headhunter stating:

> I have some good news. I met with my client, the General Counsel of Amalgamated Bank, who is doing my McKesson case, and I told her that I planned to leave Levi & Korsinsky. She was very supportive, and said that she would work to ensure that I can take that McKesson case with me when I go.

PLF ESI 0000894. *Id.*





## M.   Plaintiff's Employment Termination

181.   As of March 15, 2019, Plaintiff had used 56 hours of her available annual vacation of 80 hours and 32 of 40 hours of available annual sick/personal time.  L&K001694. Roberts Decl. Ex. 85.

182.   On March 15 Levi wrote to Korsinsky, noting the amount of time off Plaintiff had taken off from work so early in the year and remarking, "this is another data point why we know she's is [sic] planning too [sic] leave."  L&K001694.  *Id.*

[redacted]

[redacted]

[redacted]

[redacted]

188. Defendants' annoyance with Plaintiff's unrelenting, belligerent, defiant and disruptive performance and behavior, exacerbated by her outright lying, compounded by the risk that Plaintiff would leave L&K with at least one significant

L&K client and matter in which L&K had a large investment and with L&K associates, reached the breaking point, animating the decision to terminate her employment on March 28, 2019.   Levi. Tr. 67:10-71:16; L&K 000573; 000575; 000576; 000578. Roberts Decl. Exs. 3 and 89.

189.   Korsinsky met with Plaintiff on March 28, 2019 and told her that her employment was terminated, explaining his lack of trust that she acted in L&K's interest and in her loyalty to L&K.  Pl. Tr. 271:13-72:14, 38:24-39:11. Roberts Decl. Ex. 2.

190.   During their meeting on March 28, 2019, Plaintiff falsely repeated to Korsinsky that she was not at work March 26 and 27 because she was sick, adding that she found it offensive that he had questioned what she was working on, and not mentioning her absence for scheduled interviews with a prospective employer, and she falsely denied engaging in an employment search.  March 28, 2019 Audio Tr. 9:14-10:18, 52:12-53:5.  Roberts Decl. Ex. 42.

191.   Although Plaintiff had written to her headhunter on February 7, 2019 to announce that the Amalgamated Bank McKesson case was "totally portable," a recording she made surreptitiously during her March 28, 2019 meeting with Korsinsky shows that she denied telling the Amalgamated Bank General Counsel about her intent to leave L&K and her interest in having Amalgamated Bank follow her to a new firm.   March 28 Audio Tr. 6:9-8:10. Roberts Decl. Ex. 42.

192.   During the March 28, 2019 meeting, Plaintiff told Korsinsky that the <u>only</u> reason she had been unhappy at L&K was because she wanted more compensation.  March 28, 2019 Audio. Tr. 31:24-32:20 ("I think things could be better, because I think my compensation should be higher….[b]ecause that is the only thing I'm very unhappy about here.").  *Id.*

193.   During the March 28, 2019 meeting, Plaintiff reiterated that she was not unhappy at L&K other than wanting more compensation and that she was trying to remedy that by bringing in more money to the firm.  March 28, 2019 Audio Tr. 44:5-9; 11-14. *Id.*

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

**N.   Plaintiff's Documents and Testimony Reveal Her Faithless and Disloyal Service**

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

198.   Plaintiff breached her duty of loyalty to L&K by binding L&K to accept a fee of $1.1 million for the Fox case after she had been specifically instructed to accept no less than $1.5 million that had already been escrowed. Korsinsky Tr. at 317:3-318-3; 389:9-24. Roberts Decl. Ex. 4.

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██

200.   As recorded by Plaintiff between March 5 and 8, 2019, Korsinsky told Plaintiff that he thought she had acted to marginalize his participation in the McKesson case and was not acting like a team player, detrimentally affecting the profitability of the case to L&K and creating a power struggle with him.  March 5-8, 2019 Audio Tr. 12:21-13:7, 20:10-16. Roberts Decl. Ex. 97.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

203.   Apparently aware of the ethical concerns about securing the transfer of Amalgamated Bank's McKesson case while she still was employed by L&K, Plaintiff denied to Korsinsky that she had disparaged L&K in speaking with Amalgamated Bank's General Counsel or that she had said anything to her contact at Amalgamated Bank about leaving L&K.   March 28, 2019, Audio Tr. 5:20-25, 6:9- -8:10. Roberts Decl. Ex. 42.

48

### O.   Plaintiff's Documents and Testimony Reveal Her Tortious Interference with Prospective Economic Advantage

205.   Plaintiff expected Lebovitch to pay her as much as $500,000 for "handing over the [Amalgamated Bank] client and getting paid for that."  Pl. Tr. 199:13-15. Roberts Decl. Ex. 2.

206.   The sum Plaintiff was to receive from Lebovitch was based on the amount of time Plaintiff had billed on the McKesson matter while employed by L&K and receiving her salary from L&K until her employment termination on March 28, 2019.  Pl. Tr. 192:8-13; 193:24-194:3. *Id*.

207.   Plaintiff testified: "I thought he [Lebovitch] would be paying me for my work that I had already put in on my time."  Pl. Tr. 192:8-13. *Id*.

209.   Plaintiff believes the value of her L&K time worked in the McKesson case is $500,000.  Pl. Tr. 194:14-21.  Roberts Decl. Ex. 2.

210.   Plaintiff's deal with Lebovitch for handing Amalgamated Bank's McKesson matter to Lebovitch was not in writing because "Mark [Lebovitch] refused to put anything in writing because he didn't want it to be discoverable for Ed [Korsinsky]."  Pl. Tr. 201:2-5. *Id*.

211.   Three months after Plaintiff's employment termination, Plaintiff delivered her side of the deal with Lebovitch when Amalgamated Bank sent a letter on July 2, 2019 to Korsinsky notifying him that L&K was being substituted in the McKesson litigation and directing L&K to "provide Mr. Lebovitch with all files, work product, and other materials relating to this case as promptly as possible." August 19, 2019 Letter from Amalgamated Bank.  Korsinsky Dec. ¶10, Exhibit 1.

212.   Although Plaintiff performed her side of the deal, Lebovitch refused to pay her, leaving Plaintiff "really mad, because [she] felt like Mark [Lebovitch] went back on the deal."  Pl. Tr. 200:20-23.  Roberts Decl. Ex. 2.

**P.   Plaintiff Did Not Engage in Protected Activity**

213.   Plaintiff never utilized any of the complaint procedures detailed in L&K's Handbook concerning discrimination, harassment or retaliation.  Hopkins Tr. 102:13-103:4. Roberts Decl. Ex. 44.

214.   Plaintiff did not complain or grieve in writing to "any agents, employees, or other representatives of L&K, Korsinsky and/or Levi "concerning any alleged discrimination or unfair treatment of Plaintiff or retaliation against Plaintiff."

Plaintiff's Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 10, October 28, 2021; Plaintiff's Supplemental Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 10, December 22, 2021 (Dkt. No. 53-1); Plaintiff's Second Supplemental Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 10, February 4, 2022.  Roberts Decl. Ex. 99.

215.   When Plaintiff told Hopkins that she was unhappy with her bonus, she did not mention anything about gender discrimination or causing Hopkins to believe she was complaining about gender discrimination. Hopkins Tr. 102:19-103:4. Roberts Decl. Ex. 44.

216.   When Plaintiff asked Hopkins if she thought Korsinsky and Levi wanted her to leave L&K, Hopkins said she thought that was so and that Plaintiff should start looking for another job, explaining that Korsinsky and Levi were unhappy with Plaintiff's performance including a spreadsheet showing cases "go to die" and "they were unhappy that she wasn't getting cases on file because it was costing the firm money." Hopkins Tr. 103:6-21. *Id.*

217. Plaintiff did not write to "any agents, employees, or other representatives of L&K, Korsinsky and/or Levi" "concerning any complaints or grievances (whether formal or informal, oral or written)" made by Plaintiff

"concerning any alleged discrimination or unfair treatment of Plaintiff or retaliation against Plaintiff." Plaintiff's Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 10, October 28, 2021; Plaintiff's Supplemental Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 10, December 22, 2021 (Dkt. No. 53-1); Plaintiff's Second Supplemental Responses and Objections to Defendants' First Request for the Production of Documents, Response to Request No. 10, February 4, 2022. Roberts Decl. Ex. 99.

218.   On the evening of March 28, 2019, after learning about her employment termination, Plaintiff accessed the confidential electronic files of L&K, including those involving matter status and litigation strategy concerning publicly traded companies, and she emailed varied documents to herself, including emails and their attachments, to herself without obtaining consent of L&K or affected clients of L&K or reviewing ethical or disciplinary rules.  Pl. Tr. 285:13-23, 288:15-291:19. Roberts Decl. Ex. 2.

220.   Plaintiff had acknowledged L&K's EMAIL/INTERNET/VOICE-

MAIL POLICY which states:

**ACKNOWLEDGEMENT OF E-MAIL/INTERNET/VOICE-MAIL POLICY**

> I UNDERSTAND THAT ALL ELECTRONIC AND TELEPHONIC COMMUNICATION SYSTEMS AND ALL INFORMATION CREATED BY, TRANSMITTED BY, RECEIVED FROM, STORED IN, OR DELETED FROM THE FIRM'S SYSTEMS ARE THE PROPERTY OF THE FIRM. I ALSO UNDERSTAND THAT THESE SYSTEMS ARE TO BE USED SOLELY FOR JOB RELATED PURPOSES AND NOT FOR PERSONAL PURPOSES (OTHER THAN REASONABLE LIMITED PERSONAL USE TO THE EXTENT NOT INTERFERING WITH WORK) AND THAT I HAVE NO EXPECTATION OF PRIVACY IN CONNECTION WITH THE USE OF THIS EQUIPMENT OR WITH THE CREATION, TRANSMISSION, RECEIPT, STORAGE, OR DELETION OF INFORMATION USING THIS EQUIPMENT.
>
> I AGREE NOT TO USE A CODE, ACCESS A FILE, OR RETRIEVE ANY STORED COMMUNICATION UNLESS AUTHORIZED. I ACKNOWLEDGE AND CONSENT TO THE FIRM'S MONITORING MY USE OF THIS EQUIPMENT AT ANY TIME AT ITS DISCRETION. SUCH MONITORING MAY INCLUDE PRINTING AND READING ALL EMAIL AND VOICE-MAIL ENTERING, LEAVING, OR STORED IN THESE SYSTEMS, AND ALL INTERNET ACTIVITY AND COMMUNICATIONS.

Pl. Tr. 305:2-20.; L&K 000006.  Roberts Decl. Ex. 2.

221.   Notwithstanding her clear understanding of the ethical and professional

reasons that confidential information pertaining to client cases or affairs, including

information involving publicly traded companies, could not be removed from L&K's premises or systems, Plaintiff sent "a lot of documents," including status reports, to her personal email account over a span of "like a couple of hours" on March 28, 2019, after her employment was terminated. Pl. Tr. 284:3-17, 285:13-23, 289:17-20. Roberts Decl. Ex 2.

222.  Plaintiff believed the documents she sent to herself would help her by serving as "insurance" if she was not successful in working out a severance agreement with L&K.  Pl. Tr. 295:2-11.  *Id.*

223.  Plaintiff secured the L&K and client documents she sent to herself on the evening of March 28, 2019, with only her email password.  Pl. Tr. 297:21-25. *Id.*

224.  Although she was an experienced litigator who had been in practice for more than 18 years, Plaintiff did not consider simply sending a document preservation notice to Levi, Korsinsky, or L&K, and she did nothing to review ethical or disciplinary rules governing her responsibilities or to notify Levi and Korsinsky. Pl. Tr. 293:21-294:7; 291:13-19; 301:21-302:4, 304:5-11.  *Id.*

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████

226.   None of the conversations that Plaintiff selectively staged and recorded surreptitiously prior to her planned departure from L&K mentions discrimination on the basis of gender, familial status or caregiver status or retaliation, or any complaint Plaintiff made about purported discrimination.  *See generally*, Transcriptions from January 8, 2019, Week of March 4, 2019, Week of March 5 through 8, 2019 and March 28, 2019.  Roberts Decl. Exs. 44, 58, 59 and 95.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

229.   At no time during any of the conversations Plaintiff recorded did she refer to a current or previous complaint about discrimination based on gender, familial status or caregiver status or any complaint related to a protected characteristic or retaliation. *See generally*, Transcriptions from January 8, 2019, Week of March 4, 2019, Week of March 5 through 8, 2019 and March 28, 2019. Roberts Decl. Exs. 44, 58, 59 and 95.

230.   During her March 28, 2019 employment termination meeting with Korsinsky, Plaintiff stated, "I love the work that I'm doing and I'm not unhappy here, except for the compensation, which I'm trying to change by bringing in more money."  Transcription from March 28, 2019 at Tr. 44:5-8.  Roberts Decl. Ex. 44.

[REDACTED]

[REDACTED]

[REDACTED]

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆

233.   Plaintiff has "lucrative" real estate investments with her husband, in addition to the income she earns as an attorney.  Pl. Tr. 121:10-16.  Robert's Decl. Ex. 2.

234.   Plaintiff has been employed by Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") since July 15, 2019.  Pl. Tr. 196:16-18. *Id*.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆

236.   Plaintiff is happy with her employment terms at Cohen Milstein. Pl. Tr. 310:25-311:3. Roberts Decl. Ex. 2.

237.   Plaintiff believes her employment arrangement with Cohen Milstein has "the potential"  for her "to make over a million dollars a year depending on how my cases do."  Pl. Tr. 311:16-19. *Id*.

238.   As of January 24, 2022, after approximately two and one-half years of employment at Cohen Milstein, Plaintiff had not yet received any commission

payments for cases or clients generated.  Pl. Tr. 123:6-25, 125:7-19.  Roberts Decl.

Ex. 2.


Dated: New York, New York                EPSTEIN BECKER & GREEN, P.C.
       September 23, 2022

                                         By:  /s/ Allen B. Roberts
                                              Allen B. Roberts
                                              Jessica Giambrone Palmese
                                         875 Third Avenue
                                         New York, New York 10022
                                         Tel: (212) 351-4500
                                          *Attorneys for Defendants*
                                         *Levi & Korsinsky, LLP,*
                                         *Eduard Korsinsky and Joseph Levi*

58