# EXHIBIT 2

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3    --------------------------- X
     AMY MILLER,

4
               Plaintiff,

5                              No.
               vs.          1:20-CV-

6                              01390

7    LEVI & KORSINSKY, LLP,
     EDUARD KORSINSKY and

8    JOSEPH LEVI,

9              Defendants.
     --------------------------- X

10

11                  January 24, 2022

12                  10:13 a.m.

13

14

15         Deposition of AMY MILLER, ESQ.,

16   held via Zoom at the Law offices of

17   Maduegbuna Cooper LLP, 30 Wall Street, New

18   York, New York 10005, pursuant to

19   Notice, before Theresa Tramondo, AOS, CLR,

20   a Notary Public of the State of New York.

21

22

23   Reported by:

24   THERESA TRAMONDO, AOS, CLR

25   JOB NO. NY5040237

Page 38

Miller

1
2 discussions among counsel, but you don't
3 always know who's out there. Because in 220
4 investigations, which is typical for
5 derivatives cases, before you file in --
6 probably anywhere, but especially if you're
7 doing a Delaware corporation derivatives
8 suit, you know, sometimes the defendants
9 will tell you who else has made 220 demands,
10 and they will ask you specifically to work
11 with the other counsel. Sometimes
12 defendants don't do that and they play the
13 counsel against each other and they won't
14 tell you who's out there. You know, so it
15 just depends on the situation.
16    Q.   And are there any types of
17 formal arrangements like to cooperate or
18 share information among plaintiffs law firms
19 where there are multiple plaintiffs?
20    A.   It can happen, and it cannot
21 happen.
22    Q.   So you've seen both types of
23 situations where it has happened and where
24 it hasn't happened?
25    A.   Absolutely.

Page 39

Miller

1
2    Q.   Good. Okay. If you're
3 representing a plaintiff in a derivatives
4 lawsuit, how -- what's the arrangement for
5 the payment of the law firm's fees?
6    A.   It depends on the client, but
7 all of the firm's fees would be contingent,
8 and you don't get paid unless you are
9 successful. And being successful could be a
10 Court decision, it could be a settlement or
11 it could be, you know, you've negotiated
12 something while you're doing a 220
13 investigation and they make changes and you
14 get paid on that.
15    Q.   And if there are multiple
16 plaintiffs, is it typical that they settle
17 at the same time with a common agreement?
18    A.   It all depends on the case.
19 I've seen it happen different ways.
20    Q.   Okay. And when multiple
21 plaintiffs agree to settle together, how is
22 the fee allocated to the various contingent
23 plaintiffs' counsel?
24    A.   It all depends on the case and
25 what discussions have happened.

Page 40

Miller

1
2    Q.   Discussions with whom?
3    A.   Among the plaintiffs' counsel,
4 if they have had discussions. Usually if
5 there's a fee, people are talking about how
6 they're going to split up the fee, whether
7 you're in the litigation or not.
8       Here's a good example. When I
9 was at BLBG, we would constantly file
10 meritorious cases that we would litigate and
11 then a firm like L&K would file a case
12 outside of the jurisdiction that we were
13 filing and litigating hard. And they would,
14 you know, just do nothing. And then once we
15 would get a settlement, they would say --
16 they would threaten to object to the
17 settlement, you know, create problems,
18 unless they got some sort of fee. So
19 basically, you know, that's how it works
20 some ways.
21    Q.   So you say people talk. We know
22 that, but what -- is this an arrangement
23 among the law firms, or is it something that
24 comes down from the Court or from a mediator
25 or from opposing counsel? How is it

Page 41

Miller

1
2 arranged?
3    A.   It depends on the situation.
4 I'm never going to tell you that, you know,
5 it's arranged X, Y, Z, because it always
6 depends on the situation and who's involved.
7       When I say who and the
8 situation, what I mean is which law firms,
9 which clients, because everything has to do
10 with what client you have for a particular
11 case, and what law firm you're working at
12 and what other cases and what other people
13 are involved. I mean, it's the dynamic of
14 the case that creates how things are
15 handled.
16    Q.   And is it on occasion, or is it
17 even maybe even common, to see that there
18 will be a settlement with a certain sum
19 designated for attorney's fees that the law
20 firms simply have to allocate among
21 themselves?
22    A.   Do you have a specific example
23 that you're trying to go for? I don't
24 understand where we're going. I've answered
25 your questions. I feel like you're just

11 (Pages 38 - 41)

```
1              Miller
2     Q.   Okay.  And we'll move much more
3  quickly and we'll not need to invoke the
4  Court's intervention if you just try to
5  restrict your answers to the questions I
6  ask.
7          Now, and sometimes apart from a
8  positive result, there can be something
9  where you realize that the case shouldn't go
10 forward, isn't that right, and you just stop
11 litigating it; is that fair to say?
12    A.   Well, I don't think you could
13 just stop litigating a case if it was filed
14 in court and you had gotten over a motion to
15 dismiss.  I'm not exactly sure what you're
16 asking.
17    Q.   Well, but are there -- I mean,
18 for instance, somebody might make a Rule 68
19 offer of judgment and you might -- have you
20 ever seen that in your practice?
21        MR. MADUEGBUNA:  Objection.
22    A.   No.
23    Q.   Okay.  Well, back on May 15,
24 2018 wasn't there a case where some news was
25 announced and the case was killed; do you
```

```
1              Miller
2  remember that?
3     A.   No.
4     Q.   One of your cases?
5     A.   No.
6     Q.   You don't remember writing to
7  your friend Kristin Davidson about that?
8     A.   I have no idea.  If you want to
9  put the document in front of me and refresh
10 my recollection, please do that, but I'm not
11 going to guess.
12    Q.   Okay.  But you have -- right now
13 you have no recollection of communicating
14 with Kristin Davidson about news being
15 announced on a Sunday night that killed a
16 case you had been working on?
17    A.   I mean, I think -- I don't want
18 to guess, but the timing -- and I don't
19 think -- I would really like to see the
20 document so I could put this in context to
21 what case, but sometimes news comes out and
22 you think it has an effect on your case, and
23 then more news comes out and it has a
24 different effect on your case.  So, you
25 know, I could have said something like it
```

```
1              Miller
2  killed my case and then a few days later,
3  things could have changed and the case was
4  revived.  So, you know, yes, news comes out
5  and kills a case sometimes, but then other
6  news comes out and changes your mind.  So I
7  don't know what specifically you're talking
8  about, but, you know, yes, news can come out
9  and kill a derivative case.  You can get 220
10 documents that show that your client doesn't
11 have a basis to bring a case.  Of course,
12 not every case is going to be successful.
13 I mean, that's -- we're working on a
14 contingency basis.  You don't think every
15 case is going to be successful.  And the
16 cases that are successful usually, you want
17 to get more than your lodestar.  You know,
18 that's a big issue for plaintiff's attorneys
19 in my field at least.
20    Q.   What do you mean by "lodestar"?
21    A.   "Lodestar" is the way that you
22 track the amount of time that your firm has
23 billed in a case.  So then when hopefully
24 you're successful and you're asking for a
25 fee, you can go to the Court and you can
```

```
1              Miller
2  say, hey, I'm entitled to XYZ fee because I
3  created this great result, and if you look
4  at my lodestar, it's -- you know, I billed
5  this amount of time, but because it was
6  contingency based, I should get, you know,
7  more than my lodestar is typically what
8  plaintiffs' attorneys say.
9     Q.   And this is just a yes or no
10 answer.  During the time that you worked at
11 Levi & Korsinsky, did any of the cases on
12 which you worked have a significant fee
13 recovery?
14    A.   Yes.
15    Q.   Name them.  Just the name.  I
16 don't want history.  I don't need anything
17 else.  I just want the names of the cases.
18        MR. MADUEGBUNA:  Counsel, you
19        can't direct the witness how to
20        answer.
21        Just answer the way you feel is
22        appropriate, Amy.
23        MR. ROBERTS:  This is a specific
24        question and we'll be going to the
25        Court if we persist in getting --
```

Miller

1
2      MR. MADUEGBUNA:  That's fine.
3      MR. ROBERTS:  -- monologues that
4   the plaintiff wants to give, or
5   frankly speaking objections.
6      MR. MADUEGBUNA:  That is not
7   speaking objections.  You're making
8   the pronouncements.  Allow her to
9   answer the question the way she feels
10   is appropriate to answer the question.
11   That's all I'm saying.
12      Q.   Name the cases, if you would,
13   please.  Name the cases, if you would,
14   please.
15      A.   Okay, what I considered a
16   significant recovery was more than a million
17   dollars, and I had Fox News that paid more
18   than a million dollars when I was there.
19   If we're going to go by significant, I'm
20   putting it over a million dollars in a fee.
21      Q.   And that's the only case?
22      A.   I had opportunities to bring in
23   millions of dollars in my Patriot National
24   case, but Ed sabotaged me because I had made
25   a request to get paid like Don and Nick.

1            Miller
2   And I've now seen the e-mails that they sent
3   on the day that I made that request and how
4   they were -- they couldn't believe that I
5   made it, even though Ed had told me that we
6   were going to put my partnership terms in
7   writing in December of 2017.  And at that
8   point I had had a significant fee come in,
9   the Fox News fee, which was, you know, more
10   than a million dollars, and so I felt that
11   it was time to talk about my partnership
12   terms and to put them in writing.
13      Q.   Okay.  Please confine yourself
14   to the questions, and we can have the
15   questions read back if you have a problem
16   with that.
17         Have you engaged in any personal
18   litigations, besides matters for businesses
19   you own with Joe Miller, that's to say, 491
20   Sixth Avenue condo, Third Street
21   Cornerstone?  Other than those businesses --
22   other than the businesses, 491 Sixth Avenue
23   condo, Third Street Cornerstone, have you
24   had any personal litigation experience?
25      MR. MADUEGBUNA:  Note my

1            Miller
2   objection.
3      A.   Not that I could remember right
4   now, but...
5      Q.   And as an attorney, an
6   experienced attorney for some 20 years or
7   more, you understand the concept of client
8   confidentiality, don't you?
9      A.   Yes.
10      Q.   And what do you understand by
11   the obligations of client confidentiality?
12      A.   You're supposed to keep your
13   client's confidences confident --
14   confidential, sorry.
15      Q.   Is it just your own client's
16   confidences or things that you also learned
17   in the course of the litigation or in
18   settlement discussions?
19      MR. MADUEGBUNA:  Objection.
20      A.   I mean, just in general, you're
21   supposed to keep your client's confidential
22   information confidential.
23      Q.   And you understand -- what do
24   you understand as the source of those
25   principles or tenets of client

1            Miller
2   confidentiality?
3      MR. MADUEGBUNA:  Objection.
4      A.   They're ethical rules.
5      Q.   And in the law firms you've
6   worked with, have they had confidentiality
7   policies?
8      A.   I'm sure they did.  I don't
9   specifically remember them.
10      Q.   And do you remember that Levi &
11   Korsinsky had client confidentiality
12   provisions?
13      A.   Yes.  Every -- I mean, it's a
14   general ethical thing.
15      Q.   And in addition to those
16   policies for confidentiality, Levi &
17   Korsinsky also had policies concerning
18   personal misconduct, right?
19      A.   They had a handbook.  I don't
20   remember exactly everything in the handbook,
21   but they certainly had a handbook that I
22   read and I signed.  And they had provisions
23   about how you're supposed to behave.
24      Q.   Right.  And in addition to
25   personal conduct there were provisions for

14 (Pages 50 - 53)

Page 58

Miller

2    Q.   Good.  And when do you think
3  that treatment less favorable to you than to
4  them started?
5    A.   Specifically I believe it
6  started when -- like, I felt different
7  treatments start once I had asked to be paid
8  similarly to Don and Nick, which happened
9  on, I think, like May 16, 2018 because I
10  believe it was Ed's birthday and I had been
11  talking to Svetlana and even Shannon about
12  getting paid like Don and Nick because they
13  both thought that I deserved to be paid like
14  Don and Nick because I was doing similar
15  work to them.  I was running cases, you
16  know, doing all the hard stuff.  I was
17  working on very complex cases as well.
18        So it began when I got -- what I
19  asked to be paid equally to them.  And I
20  made that decision to go to Ed because the
21  Fox News case had paid a significant fee of
22  over a million dollars.  And when I had been
23  promoted to partner in December 2017, I had
24  a discussion with Ed and he said that we
25  would put the terms of my partnership

Page 59

Miller

2  agreement in writing when my cases started
3  to pay some fees in 2018.
4        I had a general knowledge of,
5  you know, what it looked like to put some
6  terms in writing, because in 2011, when I
7  was an associate still at Bernstein
8  Litowitz, I had interviewed at L&K and they
9  had made me an offer to come in as of
10  counsel, and I was going to be earning
11  commissions based on, you know, my cases at
12  that point.
13        So when I got the offer back in
14  August of 2016, Ed specifically told me that
15  he wasn't going to give me the same terms,
16  but when I got promoted to partner, you
17  know, then I would be able to earn
18  commissions off of my fees.  That's now
19  going back to the December 2017 meeting.  Ed
20  specifically told me that I would be able to
21  get fees from my cases if they paid before
22  the end of the year because that was
23  something that was really important for me
24  to know, because I was given a $30,000
25  bonus, which I thought was a little bit low,

Page 60

Miller

2  based on, you know, my future at the firm
3  and what I believed that partners were
4  getting paid.  Because Ed also told me that
5  his partners made a whole lot more than
6  250,000, which he said a lot of partners
7  like Nick and Don had a base salary of 250,
8  I had a salary of 285, because that's what I
9  was making at Grant & Eisenhofer, which was
10  a more prestigious plaintiffs' firm than
11  L&K.  And, you know, so it was really
12  important to me that I would be able to
13  start earning fees from my cases as soon as
14  they started paying money in 2018 because I
15  was becoming a partner and I had been
16  promoted, so Ed said we would put the terms
17  of my partnership in writing.
18        He also told me that, you know,
19  when Nick first came on -- or he said that
20  he didn't let Nick starve when he hadn't
21  reached the terms of his partnership
22  agreement.  I've now looked at, you know,
23  the documents and it appears what Ed was
24  really saying was even when Nick's cases
25  didn't get paid -- make any money, they

Page 61

Miller

2  still paid Nick like hundreds of thousands
3  of dollars in bonuses.  So that's what I now
4  interpret, you know, Ed's comment of not
5  letting Nick starve when his cases weren't
6  making money meant.
7        So that was pretty much, you
8  know -- so I had this expectation that I was
9  going to start earning fees from my cases,
10  just like Don and Nick, based on my multiple
11  conversations with Ed and based on the offer
12  that I had gotten in 2011 when I was only an
13  associate.
14    Q.   Okay.  So you got an offer
15  letter in 2011 and that offer letter said
16  that you would be eligible for discretionary
17  performance-based bonuses up to 10 percent
18  of the net annual legal fees generated to
19  the firm above $2,500,000 for all cases on
20  which you are assigned primary
21  responsibility; is that right, that's what
22  the offer was to you?
23    A.   Yes.  And I found that
24  unacceptable even as an associate at BLBG.
25  I told my headhunter I would never accept

16 (Pages 58 - 61)

Page 62

Miller

1
2 that kind of a threshold. I thought it was
3 too high for the quality of work that I was
4 going to be doing. And then Svetlana told
5 me that Don and Nick didn't have any
6 threshold that they had to make, that they
7 just got commissions when their cases paid
8 fees. So she told me not to worry about a
9 threshold, because that isn't how Don and
10 Nick were treated. And that's exactly what
11 it looks like from the documents that L&K
12 produced that I looked at.
13     Q.   In 2011 are you -- what was the
14 reason you declined the offer? It
15 sounds you didn't -- the terms, are you
16 saying, were unacceptable or --
17     A.   There were many reasons why I --
18     Q.   You became --
19     A.   Excuse me?
20     Q.   You became pregnant; isn't it a
21 fact that you were pregnant and you didn't
22 want to take the offer in 2011 because you
23 were pregnant?
24          MR. MADUEGBUNA:  Objection.
25     Please allow the witness to answer.

Page 63

Miller

1
2     A.   As I said, there were many
3 reasons that I didn't take the offer.
4 Basically a headhunter contacted me in 2011
5 to go and interview at L&K. Mark Kelley
6 said horrible things about L&K and, you
7 know, I was interested to see if -- you
8 know, what Mark was saying was really true.
9 I was interested to see what they thought I
10 was worth, because I had had a partner that
11 I worked at Cadwalader, who had told me it's
12 always good to find out what your worth is
13 if a headhunter calls you.
14          So, you know, I wanted to go see
15 what these people were about, you know, so I
16 met with them. They obviously thought I was
17 very impressive and wanted to give me, you
18 know, an offer -- they did give me an offer.
19          One of the key things that I
20 didn't like about L&K back in 2011 was they
21 were really against institutional clients
22 for cases and I thought that really didn't
23 make sense because there were some, you
24 know, cases where it's great to have an
25 institutional client and that's going to win

Page 64

Miller

1
2 the leadership motion.
3          So it really was disturbing to
4 me that they didn't have any institutional
5 clients because I didn't think you could
6 really be successful in the complex cases
7 that I was doing without institutional
8 clients.
9          And then the other reason was I
10 had worked very hard at BLBG to change their
11 maternity leave policies. They had a
12 very -- you know, it was not comparable to
13 what the big firms had where I had come from
14 and other female associates had come from,
15 these big defense firms that were giving
16 their female attorneys 20 weeks of maternity
17 leave. So we worked very hard at BLBG to
18 change the maternity leave policy to
19 20 weeks. I talked to Ed about what his
20 policy was. It was not 20 weeks. They said
21 there was no way they could offer me
22 20 weeks. So I decided that I would stay at
23 BLBG because that, you know, it didn't even
24 make sense to even get into the compensation
25 because I was pregnant and I wanted my

Page 65

Miller

1
2 20 weeks of maternity leave. And then I got
3 promoted to senior counsel at BLBG, so I --
4     Q.   So then in 2016 you initiated
5 outreach to Levi & Korsinsky to see if you
6 could get a job there, right?
7     A.   Yes, that is correct. And I
8 thought they would hire me, since they had
9 already given me an offer.
10     Q.   And you actually, instead of
11 receiving an offer letter from them, you
12 actually wrote the terms by which you would
13 be employed starting in 2016, didn't you?
14          MR. MADUEGBUNA:  Objection to
15     form.
16     A.   I thought that was -- I thought
17 that was really odd, but Svetlana had me
18 write the terms in an e-mail, and then she
19 later told me that she thought it was really
20 important for me to do that because she
21 hadn't written the terms of her employment
22 when she got hired, and then she said that
23 L&K didn't stick to them once she started
24 working for them, so she was really trying
25 to protect me, because Ed told me he wasn't

17 (Pages 62 - 65)

                    Miller
1
2  going to give me the formal offer letter
3  like he had done in 2011, so Svetlana was
4  trying to protect me to make sure that the
5  terms of what L&K were offering were
6  actually fulfilled when they hired me
7  because she knew that they had not done that
8  with her.
9      Q.   Svetlana was an office manager;
10 is that your understanding, or did she have
11 some other position?
12         MR. MADUEGBUNA:  Objection.
13     A.   Svetlana seemed to run the
14 office.  She was in charge of the
15 paralegals.  She was in charge of pay.  She
16 seemed to do a lot of things.  Whatever Ed
17 and Joe wanted her to do for the office, it
18 seemed like she did it.
19     Q.   She wasn't a lawyer, was she?
20     A.   No, not that I'm aware of.
21     Q.   Never represented a client, did
22 she?
23     A.   I don't think so.  She was just
24 in charge of getting us paid and our
25 benefits and things like that.

                    Miller
1
2      Q.   She was an administrator, right?
3         MR. MADUEGBUNA:  Objection.
4      A.   I don't know how she was termed.
5  All I know is she worked at the office and
6  she was not an attorney, to my knowledge.
7      Q.   Good.  Now, when you were hired
8  in 2016, you knew that your pay was higher
9  than the base that partners were paid,
10 right?
11         MR. MADUEGBUNA:  Objection.
12     A.   I didn't know the terms of every
13 partner, so I did not know if the terms were
14 higher than other partners.  I knew
15 generally Ed told me that partners made 250
16 in base salary, but he was willing to pay
17 285 for me.  And, you know, my base salary
18 when I was at Cadwalader was substantially
19 similar to that, so it wasn't that --
20     Q.   And on July 6, 2016 you wrote to
21 your brother Alan and said I'm going to get
22 paid more than partners, didn't you?
23     A.   I have no idea.  You'd have to
24 put that in front of me.
25     Q.   You don't have any current

                    Miller
1
2  recollection now, though, right?
3      A.   Not specifically.
4      Q.   So when you were hired in 2016
5  at 285, was that because that's what the
6  firm intended paying you or what you asked
7  them to change so that you would receive the
8  285?  Had they initially offered you 285, or
9  did you bargain for that?
10     A.   I did not bargain for that.  Ed
11 called me in to make the offer to me, which
12 I thought was strange, because he had me
13 come to his office, but I guess I thought,
14 you know, he was trying to be personable.
15 But he told me specifically that he was not
16 going to give me, you know, the same type of
17 terms where I could earn commissions from my
18 cases immediately.  And he said once I made
19 partner, that that would be part of the
20 partnership, that I would be able to earn
21 the fees from my commissions -- I mean,
22 fees, you know, commissions from my fees.
23 So he was very specific about that.
24         We also talked about, you know,
25 where I would be able to work, because that

                    Miller
1
2  was very important to me that I would be
3  able to have a good life balance.  And Ed
4  specifically said to me, I don't care if
5  you're working on the beach as long as your
6  work gets done.  So that was really like
7  encouraging to me because I felt like as
8  long as I was getting my work done, which I
9  knew I could get my work done wherever I had
10 to do my work, you know, that was really
11 comforting to me, and that was one of the
12 major reasons that I decided to take the job
13 at L&K, because it had been an issue at
14 other firms where, you know, I would never
15 know when I would be able to come home.  So
16 that was definitely something that I was
17 very focused on with L&K.  And because Ed
18 gave me the assurances that I could work
19 wherever I wanted as long as I, you know,
20 stayed in touch with the team and got my
21 work done, you know, that was something that
22 was significant to me.
23         So -- and he also told me that I
24 would have six resources to work with and
25 that I would be running the New York

Page 70

Miller

1            Miller
2   derivatives department, and that was
3   exciting to me to be able to have an
4   opportunity where I was going to be the head
5   of a department.  You know, I was going to
6   get the opportunity to do arguments in big
7   cases, where I had been at, you know, these
8   firms that were very prestigious, so you had
9   all these top level partners who would want
10  to do the arguments.  I got to do some
11  arguments, but there was no way, you know,
12  if Mark wanted to do or Stuart wanted to do
13  an argument, you know, they were the heads
14  of the department, so they got to do it.  So
15  it was exciting to be the head of the
16  department and getting to, you know, take my
17  skills to the next level.
18      Q.   And we'll move much faster and
19  won't have to go to the Court for more time,
20  please, if you confine your answers to the
21  questions that are asked.
22           (Defendants' Exhibit 10, two
23      pages, e-mail exchange between
24      Amy Miller, Eduard Korsinsky and
25      Joseph Levi, dated 7/6/2016, Re: Amy

Page 71

1            Miller
2      Miller, Bates stamp PLF ESI 0000358
3      and '359, marked for identification,
4      as of this date.)
5      Q.   Take a look at Exhibit 10, if
6   you would, please.
7      A.   Okay.
8      Q.   Do you recognize that as your
9   e-mail to Mr. Korsinsky and Mr. Levi?
10     A.   Yes.
11     Q.   About the terms of your
12  employment?
13     A.   Yes.
14     Q.   And that is the document that
15  captures the terms of your employment that
16  started in 2016, right?
17     A.   Yes, these were the terms when I
18  was hired as "of counsel," and I expected
19  that there would be different terms once I
20  got promoted to partner.  And I accepted
21  those terms to be somewhat consistent with
22  what I was offered in 2011, but I was
23  uncomfortable with the threshold.  And then
24  I talked to Svetlana and I found out that
25  Nick and Don didn't have any threshold for

Page 72

Miller

1            Miller
2   earning fees or commissions off of their
3   cases.  So she told me that I shouldn't have
4   to have any threshold either because my work
5   was comparable to Nick and Don's.
6      Q.   And you also represented to
7   Wells Fargo that you didn't -- that the only
8   thing you had about your employment terms
9   starting in 2016 was this document, right,
10  you wrote that to Wells Fargo on
11  November 1st, 2016, didn't you?
12     A.   Wells Fargo?
13           MR. MADUEGBUNA:  Objection.
14     A.   I don't know what you're talking
15  about.
16     Q.   You don't remember writing to
17  Wells Fargo about a loan or a financing and
18  they asked for your employment agreement and
19  you said all I've got are these e-mails?
20     A.   I have no specific recollection
21  of that.  I have refinanced things so many
22  times because of not getting paid what I was
23  supposed to get paid at L&K based on the
24  representations that they made to me and
25  their unfair treatment of me, so I don't

Page 73

1            Miller
2   specifically remember that.  If you want to
3   pull up the e-mail, you can refresh my
4   recollection.
5      Q.   Now, do you remember writing to
6   Cristina Scatigno and telling her how much
7   you loved the new firm and everyone is nice
8   and supportive?
9      A.   Please tell me what date,
10  because everyone was very nice and
11  supportive until May 16, 2018 when I asked
12  to get paid exactly like Don and Nick, to
13  put my partnership terms in writing as Ed
14  represented to me in December 2017 we would
15  do after my cases started paying fees.
16     Q.   Now, are there any female
17  attorneys who you think were treated more
18  favorably than you at Levi & Korsinsky?
19     A.   I didn't know the terms of other
20  female attorneys specifically except for
21  Shannon, and Shannon had told me that she
22  had asked to be paid like Don and Nick and
23  she was told no.  And she -- you know, she
24  told me that she thought that my work was
25  certainly comparable to Don and Nick and

19 (Pages 70 - 73)

Page 74

Miller

1
2 that I should be getting paid commissions,
3 and she told me to push for them.
4      Q.   Now, when you filed your
5 complaint on February 18, 2020, what
6 specifics did you have about the
7 profitability of the work that Don and Nick
8 were doing?
9      A.   I did not have specifics, but I
10 generally knew what cases and the types of
11 cases that they were working on and the
12 types of fees, and I knew that the types of
13 fees in cases that I was working on at L&K
14 were comparable to what they were working
15 on.
16      I mean, for example, Don, he was
17 working on basically like meritless M&A
18 cases that were paying a couple hundred
19 thousand dollars if he could get a
20 settlement, you know, or a -- what were they
21 called -- a mootness fee, because, you know,
22 you couldn't bring those cases in Delaware
23 anymore after L&K got some bad decisions
24 about how disclosure-only cases were not
25 acceptable.  I think Don was involved in, I

Page 75

Miller

1
2 think, Aruba, which, you know, the whole
3 plaintiffs bar was talking about how L&K was
4 like ruining the practice area for M&A
5 cases.  So Don certainly wasn't, to my
6 knowledge, bringing in huge fees on his M&A
7 cases.
8      I think Nick, he was doing
9 securities cases, but -- and I think he had
10 started to build his docket, so, you know,
11 but his securities cases were not huge
12 securities cases.  I mean, when I was at
13 BLBG we worked on -- you know, they had the
14 billion dollar settlement in Bank of
15 America.  Like, I think Nick's were more
16 like, you know, a couple million they were
17 settling for, and then he'd maybe get like
18 you know, a couple million.  That's what my
19 big cases were doing.
20      Q.   But you're making serious
21 allegations in your complaint, and my
22 question to you is:  What specifics are you
23 relying on about your economics, Don's
24 economics, Nick's economics and the firm's
25 out-of-pocket costs for derivatives cases

Page 76

Miller

1
2 that are contingency-based?  I'm asking you
3 for the specifics.  You're making serious
4 allegations, so I'm asking what specific
5 information do you have that brings you to
6 say these things about the firm?
7      MR. MADUEGBUNA:  Objection.
8      A.   I think I've already answered
9 that, but in addition, the specifics that I
10 had was Svetlana, who was in charge of
11 paying payroll and giving these people their
12 commissions, she knew exactly what the fees
13 were and what was coming in, and she told me
14 that I should be paid like Don and Nick
15 because my cases were comparable to that.
16 And I know you're going to say, well, she
17 wasn't an attorney, but she was the person
18 who was paying the payroll.  You also had
19 Ed, who told me that I should be paid like
20 these people.  So I had an expectation, and
21 my work was certainly comparable to them.
22 Nobody ever complained about my work
23 product.  My work product was outstanding.
24      Q.   But you started in 2016.  What
25 do you know about the fees that Don

Page 77

Miller

1
2 generated in 2016 and the costs of getting
3 to those fees?
4      A.   I don't think that's relevant to
5 my claims.
6      Q.   No, no, no.  But it's relevant
7 because it's my question to you.  I said
8 what did you know about -- would you like to
9 have the question read back?  Do you have
10 any question about my question?
11      A.   I think what you asked me --
12 I've asked you -- you slightly changed the
13 question --
14      Q.   My question is do you know,
15 because you made a serious allegation.  For
16 2016 what do you know about the fees
17 generated by Don and the costs associated
18 with those fees --
19      MR. MADUEGBUNA:  Objection.
20      Q.   -- if anything?  And if you know
21 nothing, you may say you know nothing.
22      MR. MADUEGBUNA:  Objection,
23 Counsel.
24      A.   When are we -- I mean, I knew
25 that Don was making a couple hundred

20 (Pages 74 - 77)

Page 78

```
1              Miller
2  thousand dollars on his M cases for whenever
3  he was bringing them.  He certainly wasn't,
4  you know, bringing cases that were making
5  hundreds of millions of dollars for the
6  firm.  You know, he was comparable to me, so
7  was Nick.
8       Q.   What is the source of
9  information for you to make that statement
10 orally to us?
11          MR. MADUEGBUNA:  Objection.
12      A.   Well, I mean, things were
13 public.  I mean, some of the stuff was
14 publicly available information.  Like, you
15 would see like articles about things getting
16 paid, and you knew -- you knew what cases
17 were paid.  I don't understand, you know,
18 where you're coming from.
19      Q.   The amount of money that Levi &
20 Korsinsky paid to attorneys working on a
21 case, that's not public information, is it?
22          MR. MADUEGBUNA:  Objection.
23      A.   It could be if the Court ordered
24 it to be public.
25      Q.   But it's not.  It's not public
```

Page 79

```
1              Miller
2  information, is it?
3          MR. MADUEGBUNA:  Objection.
4       A.   I don't know if it's public or
5  not.
6       Q.   Okay.  But as a member of the
7  public you haven't seen it, right?
8       A.   Haven't seen what?
9       Q.   The amount of money Levi &
10 Korsinsky paid on cases that you or Don or
11 Nick or anybody else in the firm worked on.
12      A.   Like the specific fees?
13      Q.   The amount of money paid to
14 attorneys working on the cases.
15      A.   Well, I mean, I think I was sent
16 information about that by Arthur, but I
17 don't recall any of the specifics.
18      Q.   For your cases or everybody's
19 cases?
20      A.   I think he sent me everyone.
21      Q.   Okay.  You don't know what the
22 payroll expenses associated with Don's cases
23 in 2016 were, do you?
24          MR. MADUEGBUNA:  Objection.
25      A.   I don't have any specifics.  No,
```

Page 80

```
1              Miller
2  I was not aware of the exact specifics.  You
3  know, I didn't look at -- in 2016 at L&K's
4  books and records.  They were not shared
5  with me.
6       Q.   And you don't know the answer
7  for 2017 or '18 or '19, do you?
8          MR. MADUEGBUNA:  Objection.
9       A.   Not specifically.
10      Q.   And you don't know the amount of
11 fees that were generated based on those
12 cases?
13          MR. MADUEGBUNA:  Objection.
14      A.   All I know is that Shannon and
15 Svetlana told me that I should be treated
16 equally to Don and Nick in my payment, and I
17 know that Ed told me that we were going to
18 put the terms of my partnership agreement
19 into writing and that I was going to be paid
20 commissions on those fees, and that Svetlana
21 told me that Don and Nick had no threshold
22 for making commissions on their fees.  And I
23 was building a docket that was similar to
24 Don and Nick's.  You know, I expected to be
25 paid like Don and Nick because I was doing
```

Page 81

```
1              Miller
2  work like Don and Nick and I was developing
3  similar cases.
4       Q.   So the answer to that question
5  is no, you don't know; is that right?
6  That's the answer, is no; is that right?
7          MR. MADUEGBUNA:  Objection.
8       A.   L&K did not specifically share
9  that information with me.
10      Q.   Good.  And with respect to the
11 fees that correspond to the expenses -- the
12 payroll expenses, the salaries, the taxes,
13 the health insurance, the overhead for the
14 office, the cost of running the offices, the
15 office administrators, the rent, the
16 marketing, the technology, you have no idea,
17 do you, how those costs were related to the
18 cases that Don was responsible for; is that
19 right?
20          MR. MADUEGBUNA:  Objection.
21      Q.   Is that right?
22      A.   I mean, I had some talks with
23 Svetlana about how that worked before I made
24 my proposal to Ed, because she was saying
25 that, you know, Shannon had like the
```

Page 82

Miller

1
2 Connecticut office and there were certain
3 costs.  I mean, we were definitely talking
4 about stuff like that, but she said that
5 that stuff didn't matter for me making my
6 proposal, that, you know, just go in and get
7 your compensation fixed and then, you know,
8 you can look at, you know, how things are
9 making money.  And that makes sense to me
10 based on the documents that I've seen that
11 L&K produced because it looks like even when
12 Nick's cases weren't making money, he was
13 still, you know -- they just gave him
14 bonuses, even if he wasn't earning
15 commissions, you know, so.
16     Q.   And you don't know anything
17 about Nick's experience of having very, very
18 profitable years and perhaps years that were
19 not as profitable, do you?  You really don't
20 know the answer to that, do you?
21     MR. MADUEGBUNA:  Objection.
22     A.   No.  But the thing is you expect
23 to have profitable years and you expect to
24 have unprofitable years.  You expect that
25 you're going to be working for a firm that

Page 83

Miller

1
2 wants to invest in you and that, you know,
3 they're going to pay you what you're worth,
4 which didn't happen here to me.
5     Q.   And just like you don't know it
6 for Nick, you don't know it for Don, do you?
7     MR. MADUEGBUNA:  Objection.
8     A.   I don't know the specifics, but
9 I know that I deserve to be paid exactly
10 like them.
11     Q.   And you don't know if -- not
12 only for Nick and Don for one year, but you
13 know it for every year you were there, 2016,
14 '17, '18, and 19; isn't that right?
15     MR. MADUEGBUNA:  Objection.
16     A.   Well, let's put this into
17 context.  I was promoted to partner and
18 started being a partner in 2018.  This was a
19 very strangely run firm where there were no
20 partner meetings.  I've never been at a firm
21 before where the partners don't have like a
22 meeting to talk about like the firm and firm
23 issues.  It was basically, as I know now,
24 nobody was considered an equity partner
25 except for Ed and Joe.  So the only way you

Page 84

Miller

1
2 were really, you know, kind of like -- I
3 guess I had termed it "equity," but what I
4 meant was you were going to get paid your
5 commissions on your case because as Ed and
6 Nick -- I mean, Ed explained to me, this was
7 not a firm where everyone just shared in the
8 profits, you only shared in the profits of
9 your cases.  So it was particularly
10 important to be able to, let's say, settle
11 your cases and not have Ed sabotage the
12 settlement of cases so he wouldn't have to
13 pay you fees because he knew that you were
14 asking to be paid fees like Don and Nick.
15     Q.   Did -- now, did Ed want to make
16 the Fox case more profitable for Levi &
17 Korsinsky than you did?
18     A.   I think I was the one who wanted
19 to make --
20     MR. MADUEGBUNA:  Objection to
21 form.
22     A.   -- Fox most profitable.
23     Q.   That's a yes or no.
24     A.   When I first proposed, that was
25 a case that I was really into.  What?

Page 85

Miller

1
2     Q.   That's a yes or no question.
3     A.   What?
4     Q.   That's a yes or no question.
5 Did Ed Korsinsky want to make the Fox case
6 more profitable for Levi & Korsinsky than
7 you did?
8     A.   No.
9     Q.   What was the amount of money
10 Ed Korsinsky wanted for the firm in the Fox
11 case?
12     A.   I don't know specifically.  I
13 know he was happy to let Andy settle a fee
14 dispute for anything over a million dollars,
15 and he had authorized Andy Dupre to settle
16 that with Stuart Grant during Passover.
17     Q.   Now, time out.  Weren't you
18 cutting Ed out of those discussions and
19 writing to Nancy and Ed -- Nancy and Andy,
20 and saying, I'm not going to tell Ed, I'm
21 going to conceal this from Ed, I'm going to
22 hide this from Ed, I'm going to settle for
23 less than Ed wants.  You have e-mails saying
24 that, don't you?
25     MR. MADUEGBUNA:  Objection.

Miller

1  of work that I had done on that case, since
2  of work that I had done on that case, since
3  that was my case, and I did the vast
4  majority of the work -- I was working on --
5  you know, I got to interview Viet Dinh, who
6  was a Fox News director, who I had deposed
7  when I was at BLBG, when we had a successful
8  case against News Corp. before it split up
9  into Fox News -- so I had special expertise
10  for this.
11     So basically Ed didn't want to
12  agree to what BLBG was willing to pays us.
13  BLBG had been appointed as co-lead counsel,
14  so typically they have authority to decide
15  what they were going to pay people who were
16  not co-lead counsel.  We said that we never
17  agreed to that as part of our terms of
18  working with them and that we thought we
19  deserved to get more.  So we basically -- it
20  was like pretty unprecedented that we went
21  outside the group and filed this special
22  motion to have the Court decide what our fee
23  was going to be.  I mean, in most cases
24  probably the Court would have said too bad,
25  BLBG gets to decide.  But I have a lot of

Miller

1  credibility with Chancellor Bouchard,
2  credibility with Chancellor Bouchard,
3  because I had practiced with him in private
4  practice before he became Chancellor
5  Bouchard.
6     So I made the argument to him,
7  and this was a situation where Ed really
8  wanted me to use my gender inappropriately
9  during the argument, and I disagreed with Ed
10  about that, because there had been a senior
11  partner at BLBG during the mediation who had
12  touched me inappropriately, and then other
13  partners had made inappropriate sexual
14  comments to me, so Ed really wanted me to
15  play that up.  But I decided that the merits
16  of my work, which was what counted, and I
17  had an affidavit that I filed with the Court
18  that outlined all of the work that I did,
19  and it was super impressive.  And so Andre
20  Bouchard decided that he would put 1.5
21  million into escrow.
22     So when we got a settlement --
23  when Andy was able to negotiate a
24  $1.1 million settlement with Stuart Grant,
25  that was like basically double our lodestar,

Miller

1  so it was a great payoff.  And Ed had said
2  so it was a great payoff.  And Ed had said
3  that he would be happy with something over a
4  million, because he had tried to negotiate,
5  and he had a conversation with Mark and
6  Jerry, that I was not on, that he reported
7  to me, and he wasn't able to get them, I
8  think, over like 800,000, or they might have
9  said 600,000 to him, and he was really
10  offended.  So he basically needed Andy to
11  handle the negotiations because he couldn't
12  get it done.
13     Q.   Now, you know that's not true,
14  don't you?  You know that Ed said to you, I
15  want a million five; isn't that right?
16        MR. MADUEGBUNA:  Objection.
17     A.   No.  I was the one actually who
18  proposed the million five because I thought
19  it was three times our lodestar, so, you
20  know, it wasn't unreasonable.  This was a
21  situation where the lead counsel were
22  getting paid $4,000 an hour, and I think
23  what I was asking was like 625 an hour.  So
24  it was something that I came up with that I
25  thought would be reasonable when I was

Miller

1  making the presentation to the Court.
2  making the presentation to the Court.
3  Because credibility with the Delaware
4  Chancery Court is extremely important to me
5  because that is where I practiced the
6  majority of my time.
7     Q.   And you know that you had
8  communications where you said to Andy and
9  Nancy, I'm going to keep Ed in the dark;
10  isn't that right?
11        MR. MADUEGBUNA:  Objection.
12     Q.   I'm not going to tell Ed what
13  we're doing?
14        MR. MADUEGBUNA:  Objection.
15     Q.   Isn't that right?
16     A.   If you could put that -- if you
17  could put the specific e-mail in front of me
18  that would be helpful, because the way I
19  remember it was we weren't telling Ed and
20  Joe what was going on was because it was
21  Passover and they don't communicate or use
22  any electronics when it's a Jewish holiday
23  or when it's the Sabbath.
24     Q.   You wrote to Nancy -- you wrote
25  to Andy on April 6th and said, we don't want

Miller

1
2 to give Ed an opportunity to mess with
3 resolving this fee issue; do you remember
4 writing that?
5     A.   Not specifically --
6         MR. MADUEGBUNA:  Objection.
7     A.   -- but if I wrote it, perhaps
8 because it was Passover, you know,
9 everything was going to work out and I did
10 think it was in the best interest for us all
11 to settle because we had to work with these
12 fees -- these firms again, and if we didn't
13 settle, then it was going to be costing L&K
14 more money if a special master was
15 appointed, because typically special
16 masters, you know, they could be billed out
17 at a thousand dollars an hour.  And this was
18 complicated, you know, stuff, and I'm sure
19 they would have billed up a ton, and then
20 that would have been reducing the amount of
21 fee that we could have gotten.  And Ed and
22 Joe all told me that, you know, they wished
23 that I would have consulted with them before
24 I settled, but it was Passover so they knew
25 that I couldn't.  And, you know, they also

Miller

1
2 said that they thought they would have come
3 to the exact same conclusion and that they
4 would have settled, so --
5     Q.   Now, let's just look at reality.
6 That's exactly the opposite of what you
7 wrote to Andy at the time.  You never
8 mentioned Passover.  It's exactly the
9 opposite of what you wrote to Nancy at the
10 time.  You didn't mention Passover.  It's
11 exactly the opposite of what you wrote to
12 your mother Barbara at the time.  You never
13 mentioned Passover.  All you talked about is
14 how you were going to keep Ed in the dark
15 and you were going to make a deal and not
16 have him mess with resolving the fee issue;
17 isn't that right?
18         MR. MADUEGBUNA:  Objection.
19     A.   If you want to put it in front
20 of me, I felt very strongly that we should
21 settle the case because we were working on
22 other cases with these people, I did not
23 want to cost L&K extra money with the
24 special master, and it was Passover.  I'm
25 sure we didn't talk about that it was

Miller

1
2 Passover and that Ed wasn't available
3 because we all knew that, because L&K's
4 New York office, you know, took vacation
5 time that I never got to take most of the
6 time whenever there was a Jewish holiday
7 that they weren't allowed to, you know, do
8 any operations on.
9     Q.   Right.  But in reality when you
10 were writing to Andy and Nancy, you were
11 saying to them, I'll communicate with Ed,
12 you didn't say anything about Passover, but
13 you said I'll do it only if I have to; isn't
14 that what you --
15         MR. MADUEGBUNA:  Objection.
16     A.   I mean, you're looking at a
17 document that you're not even showing me,
18 and I think that's kind of unfair.  I can't
19 remember exactly what I wrote.
20     Q.   No, but you seem to remember
21 something about Passover about which you
22 never wrote; isn't that right?
23         MR. MADUEGBUNA:  Objection.
24     A.   That is exactly true.  And it
25 was definitely Passover when that case

Miller

1
2 settled.
3     Q.   And you were keeping Ed and --
4 how long is Passover?  How many days are
5 observed where Ed and Joe didn't work during
6 Passover?
7     A.   Honestly I'm not an Orthodox Jew
8 and I did not memorize all of the times that
9 they had to be home for Passover because
10 generally I just kept on working.
11     Q.   So you don't -- how many days in
12 any single stretch was Ed unavailable to you
13 because of his religious observance?
14     A.   I don't know.  We'd have to look
15 at the calendar and see what exact days --
16 you know, see where the Passover fell with
17 relation to, you know, the Friday.  And I
18 have no idea.  It's not my religion.  I'm
19 not an Orthodox Jew.
20     Q.   And what about sending an e-mail
21 so he could read it, when he's not observing
22 the holiday, when the holiday observance has
23 ended, so he can pay attention to e-mails;
24 you never sent him an e-mail saying I'm
25 setting you up and keeping you in the dark,

25 (Pages 94 - 97)

Miller

1
2 did you?
3        MR. MADUEGBUNA:  Objection.
4   Sorry.  This is ridiculous.
5   A.   I'm pretty sure I sent an e-mail
6 to Ed telling him about the result.
7   Q.   The result, but what about what
8 you were responsible to do as an attorney
9 working for his firm?
10   A.   As I said, he gave Andy
11 authority to settle the case.  Andy was the
12 one who physically settled the case with
13 Stuart Grant.  I did not say anything to
14 settle the case.  I then relayed what Andy
15 did to Ed and Joe.  They told me that they
16 were upset that I settled it on Passover
17 when they were unreachable, but that they
18 would have probably come to the same
19 conclusion to settle because we were going
20 to still be working with these people and
21 nobody wanted to pay a special master to
22 figure out what fee we would get.  And it
23 was a really good result because it was
24 double the lodestar that we had.  I mean,
25 when I wasn't at L&K and I saw the fee that

Miller

1
2 they got from my McKesson case, they -- it
3 looks like, from what L&K disclosed, they
4 didn't even get paid their lodestar.
5   Q.   You wrote to your mother that Ed
6 wanted a million five in the case, right?
7   A.   Everyone wanted a million five.
8 If you could get a million five that would
9 have been spectacular, but that wasn't
10 possible.  It was possible to get over a
11 million, which was generally acceptable as a
12 win, so that's what we did.  We got a win on
13 the case.
14        I was very focused on closing
15 out that deal because Ed had told me once I
16 had brought in fees that I would get paid
17 for my cases.  And I saw that as being a
18 million dollar fee, significant, that I was
19 going to bring in, and then I could ask to
20 get paid on my cases just like Don and Nick.
21 So it was important for me to settle it and,
22 you know, I thought I had authority.  They
23 told me that they were unhappy that I
24 settled it on Passover, but they thought
25 that they would come to a similar conclusion

Miller

1
2 because it was a win.
3   Q.   That was never said and it was
4 never written by you or them or anything you
5 wrote to your mother to Nancy or to Allie;
6 isn't that right?  You don't have a -- with
7 all the writing you did, you never had a
8 writing talking about Passover, you never
9 had a talk -- you never had a writing where
10 Ed said I will take less than a million
11 five, and all of your writings talk about
12 keeping Ed in the dark and having a plan so
13 that he won't mess with resolving the fee,
14 having nothing to do with Passover; isn't
15 that right?
16        MR. MADUEGBUNA:  Objection.
17   A.   No.  I don't know.  I don't know
18 all of my writings.  You haven't shown me
19 any of my writings.  And I also communicate
20 via telephone, so not everything that goes
21 on in my life is reflected in my e-mails.
22   Q.   But if Ed was observing
23 Passover, you wouldn't have a phone
24 conversation with him, you'd put something
25 in an e-mail --

Miller

1
2   A.   No.  I would talk -- you just
3 said that nothing is reflected in your
4 e-mails about this.  So I'm saying that I
5 could have talked about these things in a
6 phone call, or I could have seen my mother
7 or, you know.  I mean, just because it's not
8 in writing doesn't mean it doesn't happen.
9 And I'm sure there are some things that you
10 might think that are in writing that didn't
11 happen, you know like I mean writing is just
12 a contemporaneous thing.
13   Q.   You remember writing to your
14 mother saying that you knew that -- how well
15 you did at the firm was going to be related
16 to whether you earned some real additional
17 money in fees; isn't that right?
18        MR. MADUEGBUNA:  Objection.
19   A.   I wanted to earn fees so I could
20 be paid commissions like Don and Nick.  That
21 was my understanding of coming to L&K,
22 getting promoted to partner, was I was going
23 to be earning commissions.
24   Q.   And you wrote that?
25   A.   Yes.

Page 102

1        Miller
2    Q.   And you wrote that on March
3  where -- wait just a minute.  You wrote that
4  to your mother on March 22, 2018, right?
5    A.   I have no idea.  You're reading
6  from a document that you're not showing to
7  me, which, you know, I'm not going to
8  confirm something unless you show me the
9  document.
10   Q.   Do you remember writing
11 something like that to your mother at any
12 time?
13       MR. MADUEGBUNA:  Objection.
14   A.   I remember -- I remember it
15 being something that I told everyone, that I
16 was going to start earning fees on my cases
17 once I got promoted to partner at this
18 place, because that was consistent with my
19 understanding based on what Ed had told me,
20 my offer in 2011.  So, yeah, I expected to
21 be earning fees on my cases once they
22 started paying, and of course, I wanted them
23 to be significant, so I could be earning
24 lots of commissions.
25   Q.   And you knew that Ed wanted a

Page 103

1        Miller
2  million five to boost up of the profit to
3  the firm; isn't that right?
4        MR. MADUEGBUNA:  Objection.
5    A.   No.
6        MR. MADUEGBUNA:  Asked and
7    answered.
8    A.   No.  One million five was a
9  placeholder that we put into a motion.  It
10 would have been nice to get one million
11 five, but nobody thought that was realistic.
12   Q.   Well, didn't you write to your
13 mother on April 6, 2018 saying that the fee
14 for Fox will be a million fifty, not the
15 1.5 million that Ed wanted?
16       MR. MADUEGBUNA:  Objection.
17   Q.   April 6, 2018?
18       MR. MADUEGBUNA:  Do you want to
19   show the witness the documents that
20   you're referring to, Counsel?  She's
21   been asking you for a while about
22   that.
23       MR. ROBERTS:  No.  This is about
24   the witness's recollection.  This is
25   about the witness's recollection.

Page 104

1        Miller
2    We've having difficulty and we're
3    losing time on exhibits.  I want to
4    know what the witness's recollection
5    is.
6    A.   Okay.  My recollection is that,
7  of course, everybody wanted to be paid as
8  much as possible.  We had made a motion to
9  get paid up to 1.5 million, which was three
10 times our lodestar.  Anything over a
11 million, which was double our lodestar, was
12 a total win, because we knew what other
13 people were getting paid as well, so we knew
14 that that was more than what other firms had
15 gotten paid who were in similar type
16 situations.
17   Q.   And putting aside what you've
18 spoken about today about Passover, when you
19 wrote to your mother on April 6, 2018, you
20 said, I talked with Nancy, the L&K partner
21 whose client is in the case, about not
22 telling Ed until it was a done deal, of
23 course I wouldn't lie to him if he asked me
24 for an update, and I did say in my status
25 report last night that they offered -- that

Page 105

1        Miller
2  if they offered anything over 1 million we
3  are taking it without further negotiations,
4  she, Nancy, totally agreed.
5        So you are writing to your
6  mother -- incidentally, is your mother a
7  lawyer?
8    A.   No.  My father is.  And it's
9  both my mom and my dad that I --
10   Q.   Did your mother represent a Levi
11 & Korsinsky client?
12   A.   No.
13   Q.   So you were writing to your
14 mother about this confidential Levi &
15 Korsinsky and client information on
16 April 6th, 2018?
17   A.   Yes.  I probably shouldn't have
18 done that, but I'm very close with my mother
19 and it was a very stressful situation
20 because it was the big -- the first big fee
21 that was coming in, and I really wanted to
22 get -- start getting bonuses based on the
23 hard work that I was doing.
24   Q.   Well, did you do anything to
25 look at ethical and disciplinary rules

27 (Pages 102 - 105)

Page 106

1          Miller
2   before you sent this e-mail to your mother
3   on April 6, 2018?
4       A.   No.  As I said, I probably
5   shouldn't have written that.  You know, I'm
6   very close with my mother and I guess, you
7   know, I just didn't think about it.  You
8   know, I thought of her more as like -- you
9   know, as like your husband, where you have a
10  privilege.  You know, I'm very close with my
11  mother.
12      Q.   So you're writing to your mother
13  about the law firm, the law firm's client, a
14  confidential settlement position, and you
15  didn't do anything to look at the ethical
16  considerations about that?
17          MR. MADUEGBUNA:  Objection.
18      A.   No.
19      Q.   Good.
20          This will be Exhibit 11.
21          (Defendants' Exhibit 11, two
22      pages, e-mail exchange between
23      Amy Miller and family, dated 4/5 -
24      6/2018, subject Re: Some of the
25      family, Bates stamp PLF ESI 0000556

Page 107

1          Miller
2   and '557, marked for identification,
3   as of this date.)
4       Q.   And apart from -- while this is
5   happening, apart from ethical considerations
6   and disciplinary rules, you signed a
7   confidentiality agreement when you
8   acknowledged the handbook of Levi &
9   Korsinsky, you knew -- as a matter of firm
10  policy and ethical responsibilities,
11  professional responsibilities, you weren't
12  allowed to make disclosures like that to
13  your mother, who doesn't work for Levi &
14  Korsinsky, doesn't represent the client, you
15  knew that, didn't you?
16          MR. MADUEGBUNA:  Objection.
17      A.   I wasn't thinking about it
18  specifically.  As I said, you know, I'm very
19  close to my mom, and I tell her a lot of
20  things, and it wasn't really on my mind,
21  ethical considerations.  This was more
22  about, you know, just communicating with my
23  mom.
24      Q.   Don't you understand that as a
25  practicing attorney for more than 20 years

Page 108

1          Miller
2   that ethical considerations have to be
3   foremost in your mind at all times for all
4   purposes?
5       A.   Yes.  And this case has
6   definitely brought that to my attention
7   with -- because I didn't even consider that
8   all of these e-mails would be produced, and
9   I have taken that into consideration.  And
10  if you saw e-mails to my mother now, they're
11  very different than what I was writing
12  before because I learned that, you know, I
13  probably should not have been as explicit in
14  some things that I wrote to my mom.
15      Q.   Well, what other -- now that
16  you've done all that reviewing, what other
17  ethical breaches have you committed that
18  you're aware of now?
19          MR. MADUEGBUNA:  Objection.
20      A.   I'm not aware of any intentional
21  ethical breaches that I did.  I might have
22  overshared what was going on in my cases
23  because I am very into my cases like I am a
24  litigator at heart.  It is what drives me.
25  So, you know, I'm obsessive with my cases

Page 109

1          Miller
2   and I probably overshared because I like
3   them so much.  But this has been a learning
4   experience for me and I am no longer doing
5   that.  And I'm being very, very mindful of
6   the ethical considerations because this has,
7   you know, brought it to my attention.
8       Q.   You were an attorney practicing
9   for almost 17 years.  Are you saying you
10  only -- you only, since you filed this
11  lawsuit and had to produce documents, that
12  you were aware of your ethical
13  responsibility as a litigator?
14          MR. MADUEGBUNA:  Objection.
15      A.   I don't think that's what I said
16  at all.  I think I said that, you know, you
17  don't think about it outside of work all the
18  time.  Like when you're in the office,
19  obviously you're always thinking about your
20  ethical considerations, but I just thought I
21  was talking about my work and, you know, I
22  might have gone over the line because I'm
23  certainly allowed to talk to my mother about
24  certain things about my work, which are, you
25  know, public knowledge or what you would

28 (Pages 106 - 109)

Page 110

Miller

1        Miller
2 think you would see on a privilege log. I
3 mean, there are obviously certain things
4 that you're allowed to talk to your mom
5 about.
6     Q.   Okay.  So let's look at
7 Exhibit 11, please.
8     A.   Okay.
9     Q.   So if you look down at the last
10 paragraph on the first page you say, "We
11 will get a fee of $1,050,000.  Not the
12 1.5 million Ed wanted"; do you see that?
13         MR. MADUEGBUNA:  Can you allow
14     the witness to read the whole thing?
15         Amy, I will ask just, you know,
16     read the e-mail before you answer any
17     questions.
18     A.   Oh, yeah.  This is what I was
19 referring to.  Of course, Ed wanted
20 1.5 million, but we all knew that that
21 wasn't realistic, because if you see, this
22 e-mail is talking about that conversation
23 that Ed had with Mark, that Andy and I were
24 not on, where he tried to negotiate the fee
25 and utterly failed, so then we had to put

Page 111

1        Miller
2 Andy in charge, and then, you know, if it
3 was over a million, that was considered a
4 win.
5     Q.   Well, I thought it was a million
6 two you wanted.  Was that what you proposed,
7 a million two?
8     A.   I mean, we were proposing
9 numbers.  We were trying to get to a
10 settlement.  Of course, I wanted as much
11 money as we could possibly get because I
12 wanted to get a fee off of it.  So I
13 obviously I was aligned -- I was completely
14 aligned with L&K's interest because I wanted
15 to get the biggest fee possible because I
16 wanted to get paid off of that.  And I also
17 wanted to preserve our working relationships
18 with Grant & Eisenhofer and BLBG, because
19 they are major players in the litigation
20 that my department does.  So you need to
21 maintain relations.
22     Q.   And when you talk about
23 maintaining relations, who were you working
24 for?  Were you working for yourself, or were
25 you working for Levi & Korsinsky?

Page 112

1        Miller
2         MR. MADUEGBUNA:  Objection.
3     A.   I was working for L&K.
4 Maintaining relations for L&K was very, very
5 important because L&K did not have good
6 relationships with BLBG and Grant &
7 Eisenhofer.  I was like the link that was
8 providing them with a good relationship with
9 these firms because they had worked with me
10 and they liked my work so much.
11     Q.   So you think if Ed Korsinsky
12 wants something for Levi & Korsinsky and you
13 want something else, who should prevail?
14     A.   Well, as Ed told me, his name is
15 on the door, so he's allowed to do whatever
16 he wants at his firm.  So obviously if
17 there's a question between whether Amy or Ed
18 is going to prevail, he can make it happen.
19         And that is exactly what he did
20 to me after I had asked to get paid like Don
21 and Nick, and I had opportunities to make
22 that happen, he sabotaged them.  He
23 sabotaged the litigation trust counsel
24 position for Patriot National where Cerberus
25 wanted to hire us.  Cerberus is a client

Page 113

1        Miller
2 with over $55 billion in assets and, you
3 know, they wanted to hire me as their
4 attorney because I had been running the
5 Patriot National case, and that was -- could
6 have been millions of dollars in fees, and
7 he wouldn't let me accept that, and this was
8 after the April time frame.
9     Q.   So when you say that Ed ran the
10 firm, he also ran the attorneys working in
11 the firm; isn't that right?
12     A.   Well, I mean, obviously managing
13 attorneys have power to do whatever they
14 want, but I was given authority to run my
15 cases.  Of course, you check in with the
16 managing partners from time to time, but you
17 had discretion.
18         For example, I remember being in
19 a conference room with Bob Meyer and, you
20 know, Bob was talking to Ed about a case
21 that Nick had settled, and he told Ed that
22 Nick had left money on the table.  So it
23 seemed to me that, you know, people were
24 allowed to run their own cases.  You
25 consulted with Ed to the extent you needed

29 (Pages 110 - 113)

Page 118

Miller

1
2 in and, you know, how everyone kissed me
3 when I came to the first meeting, which I
4 thought was really weird. You know, I
5 thought those things were inappropriate. I
6 told Ed about them, and then he tried to use
7 them, which I thought was totally
8 inappropriate. So that was one of the main
9 reasons that I was very upset with how Ed
10 had handled this negotiation. And we knew
11 that Andy had more credibility than Ed,
12 especially with Stuart, because they were
13 both Delaware attorneys, and Andy, you know,
14 does a lot of defense work and he's very,
15 very well regarded. So he was put in charge
16 of the negotiations to get the most money
17 that L&K could get, and he felt like he got
18 even more money than Stuart and BLBG were
19 willing to give. So it was a total win.
20     Q.   As far as you're concerned; is
21 that right?
22           MR. MADUEGBUNA: Objection.
23     A.   And Ed and Joe also told me that
24 they were upset that I didn't consult with
25 them because it was Passover, but ultimately

Page 119

Miller

1
2 they said that they agreed with my judgment
3 and that they probably would have ended up
4 there.
5     Q.   Weren't they stuck with your
6 abuse of your authority; isn't that what
7 they were stuck with?
8           MR. MADUEGBUNA: Objection.
9     A.   I never abused my authority.
10     Q.   Now, you said Ed's name is on
11 the door. It's also on the paychecks; isn't
12 it?
13     A.   Yes. So he controlled them.
14           And, you know, he told me
15 regularly that he could do anything that he
16 wanted to, and that's exactly what he did.
17 I mean, when I asked, you know, to be paid
18 equally to Don and Nick on May 16, 2018, the
19 first thing he said to me was, who put you
20 up to this? I feel like there's a third
21 person in the room. Did your husband make
22 you do this? Do you want to call your
23 husband to negotiate for you? I mean,
24 that's the kind of stuff I had to put up
25 with Ed. And, you know, I told him that I

Page 120

Miller

1
2 thought that that was offensive when he said
3 it, but I was pleasant about it because yes,
4 Ed's name was on the door and I was trying
5 to get paid equally to Don and Nick because
6 I deserved it, based on what Svetlana said,
7 based on what Shannon said and based on what
8 Ed told me. So --
9     Q.   There's some background, isn't
10 there, with your husband? Your husband
11 doesn't have a regular job, does he?
12     A.   He's a real estate developer.
13     Q.   And he doesn't have regular work
14 hours, does he?
15           MR. MADUEGBUNA: Objection.
16     A.   No.
17     Q.   He doesn't have -- his regular
18 workplace is your residence, isn't it?
19     A.   No, his -- when he has work to
20 do, he's going over to property that we own
21 and he's generally doing work over there.
22     Q.   And those are LLCs that you and
23 your husband both own; is that right?
24     A.   I believe so. You would have to
25 look at my tax returns and talk to my

Page 121

Miller

1
2 accountant. I don't really get into like
3 all of, you know, who owns this and that.
4 I just know that, you know, we have rental
5 properties and things like that.
6     Q.   And because -- that makes you
7 the primary breadwinner for the family;
8 isn't that right?
9           MR. MADUEGBUNA: Objection.
10     A.   I mean, I had the steady salary
11 and I was hoping to be the primary
12 breadwinner for my family by making lots of
13 money, but we had lucrative real estate
14 investments, so I'm not sure, you know, who
15 was the breadwinner when L&K, you know,
16 wasn't giving me the bonuses.
17           MR. MADUEGBUNA: Objection.
18     Q.   What was your salary in 2021
19 from Cohen Milstein?
20     A.   I believe it's 205, because I
21 had to take a huge salary cut to go there
22 because they have a different pay structure.
23     Q.   So you're saying you started in
24 2019 at 200, is that what you; is that
25 right?

31 (Pages 118 - 121)

Page 134

Miller

1
2  based on the sentence, "The Firm also pays
3  discretionary bonuses at the end of the
4  year, dependent upon the Firm's
5  profitability.  The issuance and amount of
6  those bonuses, if any, are at the Firm's
7  discretion."  That is what they didn't pay
8  bonuses on.  I am not aware, but I expect
9  that they did pay bonuses related to the
10  second paragraph based on what -- my
11  discussions with Carol.
12     Q.   And what this says is the "bonus
13  above zero up to 5 percent of the net
14  attorneys' fees received by the Firm for the
15  cases or clients they generate," not the
16  case, not the client, "the cases or clients
17  they generate in accordance with the Firm's
18  written policy."  Let me stop there.
19        Are you aware of a firm written
20  policy about the bonus that could be
21  anything from nothing to 5 percent?
22     A.   I have not seen any specific
23  firm policy on that.
24     Q.   Did you ask to see it?
25     A.   No, I have not asked to see

Page 135

Miller

1
2  that.  It was satisfactory to me that I was
3  going to be able to get a bonus based on how
4  the entire firm performed and then I would
5  also have an opportunity to receive extra
6  bonuses based on, you know, bringing in a
7  client or generating a case.  I thought that
8  was a spectacular way to pay attorneys
9  because it motivates everyone to be trying
10  to work for the best of the firm and the
11  best of themselves.  Everyone is on the same
12  page.
13     Q.   So when you got this offer
14  letter in May of 2019, knowing that Cohen
15  Milstein was offering you $85,000 less than
16  in salary than Levi & Korsinsky paid you,
17  knowing that to get up to the amount of
18  money Levi & Korsinsky was paying you for
19  whatever else your total compensation was,
20  knowing all of that, are you saying that
21  before you accepted the offer, and in all
22  the time since you accepted the offer, you
23  never went to anybody at Cohen Milstein to
24  say I want to see the firm's written policy
25  on the bonuses?

Page 136

Miller

1
2        MR. MADUEGBUNA:  Objection.
3     A.   No.  And if you remember, when I
4  accepted this offer, L&K had fired me and I
5  was in a horrible position where I was in
6  debt to my parents for $50,000, I had to
7  actually sell stock that my grandmother,
8  great-grandmother had given me when I was
9  three years old; like it was a very
10  emotionally distressful time, and at that
11  time, you know, I needed a job.  Ha, ha, ha,
12  ha, you know.  So I had to take what was on
13  the table.  I was also going to
14  unemployment, that office, and there were
15  certain guidelines that I had to comply with
16  with unemployment because L&K had told me
17  that they were going to give me severance
18  and then they never gave me any severance,
19  which was hugely embarrassing because I told
20  unemployment that I expected to get
21  severance from L&K and then I didn't.  And
22  then, you know, I had to take whatever job
23  was offered to me as soon as possible for a
24  multiple of reasons after L&K unfairly fired
25  me for asking to get paid just like Don and

Page 137

Miller

1
2  Nick.
3     Q.   Well, we'll come to what you
4  said to other people about how your
5  employment ended and how different that is
6  from what you've just said.  But before we
7  get into that, there was a time where you
8  initiated a search to leave Levi &
9  Korsinsky; isn't that right?
10        MR. MADUEGBUNA:  Objection.
11     A.   I only sought to -- I was
12  extremely happy at Levi & Korsinsky.  I was
13  doing the kind of work that I wanted to do,
14  developing the docket that I thought was
15  going to be a great docket going forward
16  that was going to make Levi & Korsinsky a
17  ton of money, and I only became unhappy at
18  L&K when I asked to put the terms of my
19  partnership write -- when I asked to put the
20  terms of my partnership into writing in May
21  2018 and Ed started saying discriminatory
22  things to me right in that interview, when
23  he said did your husband put you up to this,
24  do you want your husband to negotiate for
25  you.

35 (Pages 134 - 137)

Page 154

1          Miller
2 take pride in my work and I always tried to
3 do my best work possible even when I was
4 being treated horribly by Ed and Joe.
5      Q.   But you understand, don't you,
6 they aren't your cases, they're Levi &
7 Korsinsky's cases, aren't they?
8          MR. MADUEGBUNA:  Objection.
9      Q.   Aren't they Levi & --
10     A.   I mean, they were my cases that
11 I had primary responsibility of working on;
12 of course, they were L&K's actual cases.  I
13 was working for L&K.  So all of the cases
14 were L&K cases, but they were the cases that
15 I had primary responsibility on, and I had
16 been asked to run a derivative department.
17     Q.   For how many years had
18 Ed Korsinsky been practicing law as of 2018?
19     A.   I have no idea.  I just remember
20 the comment that he made to me that he
21 thought I might be a better attorney than he
22 is.
23     Q.   For how many years had Joe Levi
24 been practicing law in 2018?
25     A.   I don't know.  I didn't really

Page 155

1          Miller
2 see --
3      Q.   For how many?
4      A.   I didn't really see Joe
5 practicing law.  I saw Joe, you know,
6 recruiting clients, but I never saw Joe in a
7 courtroom.
8      Q.   For how many years had Levi &
9 Korsinsky by that name been in business?
10     A.   I don't know.  It hadn't been in
11 business as long as the other firms that I
12 had been associated with.  That's what I do
13 know.
14     Q.   And what about the predecessor
15 firm to Levi & Korsinsky, how long was that
16 in business?
17     A.   I didn't even know there was a
18 predecessor.
19     Q.   Okay.  So you don't know --
20         MR. ROBERTS:  Okay.  I think we
21 can take a break now for lunch.  How
22 long are we going to -- let's go off
23 the record and decide how long we're
24 going to be off.
25         THE VIDEOGRAPHER:  We're going

Page 156

1          Miller
2 off the record now, you said?
3          MR. ROBERTS:  Yes.
4          THE VIDEOGRAPHER:  So the time
5 is currently 1:29 p.m. and we are
6 going off the record.
7          (Luncheon recess:  1:29 p.m.)

Page 157

1          Miller
2    A F T E R N O O N   S E S S I O N
3      (Time noted:  2:22 p.m.)
4          THE VIDEOGRAPHER:  The time is
5 currently 2:22 p.m. and we are back on
6 the record.
7 A M Y   M I L L E R, resumed and
8 testified as follows:
9 EXAMINATION BY (CONT'D.)
10 MR. ROBERTS:
11     Q.   Now, Ms. Miller, in 2011 the
12 offer that Levi & Korsinsky made to you
13 specifically talked about a discretionary
14 performance bonus.  Do you recall that?
15     A.   I don't recall that.  If you
16 want to put the offer letter in front of me,
17 you can put it in front of me and we can
18 look at the specific terms.
19     Q.   I will read from it, because we
20 may not be able to pull it up, but I will
21 read what it says.  It says, You will be
22 eligible for discretionary performance-based
23 bonuses of up to 10 percent of the net
24 annual legal fees generated to the firm
25 above $2,500,000 for all cases for which you

40 (Pages 154 - 157)

Miller

1
2 were assigned primary responsibility.
3        In 2011 did you have any
4 questions about what that meant?
5     A.   Oh, yes, I had lots of questions
6 that I asked my headhunter about and I
7 didn't think that was a term I was going to
8 agree to.  But ultimately I didn't even
9 think I wanted to go to L&K, so we didn't
10 even go back to them to discuss that term
11 because of all the other issues that I have
12 always told you about, the institutional
13 clients and my maternity leave issue.
14     Q.   Now, in 2016, when you set forth
15 the terms of your employment, you didn't
16 make any reference to a discretionary
17 performance-based bonus, you didn't make
18 reference to a percentage up to 10 percent,
19 you didn't make any reference to a threshold
20 of 2.5 million, you didn't ask for any of
21 those things or write that you wanted any of
22 those things; isn't that right, in 2016?
23        MR. MADUEGBUNA:  Objection.
24     A.   As I previously testified, I had
25 a discussion with Ed before I wrote that

Miller

1
2 e-mail that memorialized the terms.  So I
3 had a discussion with Ed.  He told me
4 specifically that he was not going to give
5 me the same type of offer that he gave me in
6 2011, but that I would get a similar type
7 offer when I made partner, that he was going
8 to offer me to come here at a base salary of
9 285, which he told me was higher than most
10 of the partners made, because they made 250,
11 and that I would be entitled to a bonus.  So
12 we talked about me getting a phone because I
13 didn't want to put my personal stuff on my
14 work phone.  I remember him saying like what
15 are you, Hillary Clinton, when I made that
16 request.  And I remember talking to him
17 about ensuring that I got a laptop computer
18 because every other firm that I had been to
19 had given me a laptop and I didn't have a
20 personal computer on my own.  So I was
21 memorializing the terms after Ed had
22 specifically told me that he wasn't going to
23 give me the same kind of proposal that he
24 gave me in 2011, but that we would get to
25 that type of proposal once I made partner.

Miller

1
2     Q.   And you had a right to either
3 accept those terms that you memorialized in
4 your e-mail written to Mr. Korsinsky and
5 Mr. Levi, or reject it and stay in the firm
6 you were at, or go to another firm, right,
7 in 2016?
8     A.   I don't think there's --
9        MR. MADUEGBUNA:  Objection.
10     A.   I don't think there's any
11 question that I was very excited to join L&K
12 in 2016.  I thought it was a great
13 opportunity.
14     Q.   And, in fact, in 2000 -- well,
15 in the firm that you worked for before, GE,
16 right, or G&E?
17     A.   Grant & Eisenhofer, yes.
18     Q.   Yes.  You had problems with the
19 people there, didn't you?
20        MR. MADUEGBUNA:  Objection.
21     A.   I had problems with
22 Stuart Grant and, you know, he was the head
23 of the firm, you know, I -- you know, I went
24 there with a -- some expectation and my
25 expectations were not exactly met.  I didn't

Miller

1
2 like how Stuart was treating me.  He was
3 somebody who if he liked you, he would be
4 abusive, you know; if he didn't like you, he
5 would ignore you, but he was abusive.  I
6 didn't like the fit because I was working in
7 the New York office and primarily all my
8 cases were in Delaware.  He gave me special
9 treatment because usually when Stuart hired
10 somebody, he made them take the Delaware bar
11 and come move down to Delaware, but because
12 he liked me so much, he said I could join
13 the New York office and just work on his
14 cases from New York.
15        So, you know, there were a lot
16 of things going on with Stuart and how I
17 didn't think I was being treated
18 appropriately.
19     Q.   Well, you thought he treated you
20 like crap and he made you cry; isn't that
21 right?
22     A.   That's true.  And he continued
23 to treat me like crap --
24        MR. MADUEGBUNA:  Objection.
25     A.   -- when I worked at L&K.

41 (Pages 158 - 161)

Page 166

1          Miller
2 time of your employment at Levi & Korsinsky
3 started?
4          (**DI)MR. MADUEGBUNA:  Again,
5     same objection.  I believe that we've
6     raised that privilege in this case, so
7     I'm not sure where you're going.  And
8     you're aware of it, Counsel, so.
9     There is no claim for anything other
10    than garden variety emotional distress
11    claims from this case.
12        MR. ROBERTS:  You know our point
13    of disagreement.  We can read the
14    complaint, and so can the Court.
15    Let's go on to something else.
16    Q.   You knew in 2016 that the
17 potential to make more money and get a
18 portion of fees would come only if you
19 earned something over a certain amount;
20 isn't that right, isn't that what you knew
21 in 2016 --
22        MR. MADUEGBUNA:  Objection.
23    Q.   -- in 2016 about your employment
24 at Levi & Korsinsky?
25        MR. MADUEGBUNA:  Objection.

Page 167

1          Miller
2     You can answer.
3     A.   I didn't know that that was
4 necessarily true.  I was basing my knowledge
5 based on what kind of offer they -- letter
6 that they gave to me back when I was an
7 associate.  So I thought that I would have a
8 potential to earn commissions on the cases
9 that I had primary responsibility for
10 because that was generally consistent with
11 my understanding of the offer that they gave
12 me back in 2011.  And I didn't think, you
13 know, I would be getting a worse offer when
14 they were promoting me to partner and they
15 actually had seen my work.
16        And the big point about that is
17 that's back in 2011, when they made the
18 offer.  They had never even worked with me.
19 I mean, Ed and Joe, they'd never seen my
20 work.  I'm not sure that Joe has seen my
21 work now, but I know Ed has seen my work
22 when --
23    Q.   Could you answer my question.
24    A.   -- and he told me that I was
25 certainly doing partner level work.

Page 168

1          Miller
2     Q.   Let's stay with the questions,
3 if we could.
4        But your understanding is
5 memorialized -- when did you start working,
6 May 16th or something like?
7     A.   Are you talking --
8     Q.   I'm sorry.  It was August 16,
9 2016, right?
10    A.   I started working, I believe --
11 I believe in the middle of August of 2016;
12 although, Ed was already trying to pick my
13 brain, before I started working, about the
14 Tesla case.
15    Q.   And before you accepted the
16 offer you understood, as early as June 2016
17 in a -- actually you write it to your mother
18 on June 17, 2016, It seems like I would have
19 the potential to make a lot of more money at
20 Levi & Korsinsky since I would get a portion
21 of the fees if I earned over a certain
22 amount, plus I would get to do everything
23 and feel like a real attorney again, so who
24 knows, I hope something works out soon and
25 it's good.  That's what you wrote to your

Page 169

1          Miller
2 mother on June --
3     A.   Yes.  And that's totally
4 consistent with my testimony that I was
5 basing my knowledge back on the offer that
6 they gave me in 2011.
7        MR. MADUEGBUNA:  Theresa, note
8     my objection to that question.  I
9     didn't get a chance to object.
10    Q.   So why did you leave G&E?
11    A.   I left G&E because I was unhappy
12 with how it was working out with Stuart, and
13 I really didn't like being there.  And also
14 the thing about me wanting to be a full
15 attorney again was -- you know, when I went
16 to G&E, I told Stuart that I did not want to
17 make partner, that I just wanted to be of
18 counsel like my friend Diane Zilka.  I
19 didn't want any responsibilities.  I just
20 wanted to work on cases and do good work.
21 And Stuart looked at me and said, no, you're
22 going to be considered for partner in three
23 to five years.  So we were -- you know,
24 because they were very top-heavy there, they
25 had tons of partners, you know, and I wasn't

43 (Pages 166 - 169)

Miller

1
2 happy not getting to do all the various
3 things that I liked doing after -- you know,
4 because I was working really hard and I felt
5 like if I was working so hard, I could be
6 running a department and making more money.
7     Q.   And what about the fact that at
8 G&E you got almost no bonus, did that bother
9 you?
10     A.   I knew that going in.  I had
11 negotiated a higher salary than I was
12 getting at BLBG because they told me that
13 the bonus structure was different at G&E and
14 that they didn't pay bonuses like they paid
15 at BLBG.  So I was well aware.  And that was
16 a trade-off that I was fine to make because
17 I thought I would be working less because I
18 was not -- I didn't view myself as on a
19 partnership track.
20     Q.   So you had experience from G&E,
21 knowing that if you get a higher salary, you
22 may get a lower bonus; isn't that right,
23 that's what you knew from G&E, right?
24     A.   That was for an of counsel
25 position.  When you're a partner at G&E,

Miller

1
2 it's a --
3     Q.   But when --
4     A.   -- lot of different than.
5     Q.   Well, but when you're a partner,
6 you can be a partner that's an equity
7 partner in some firms or you can be a person
8 who has the title of partner; isn't that
9 right?
10          MR. MADUEGBUNA:  Objection.
11     Q.   Isn't that right; there's a
12 difference between a person who has a title
13 of partner and a person who is a partner who
14 has a partnership agreement and the
15 partnership agreement says certain things
16 about relations and economics?
17     A.   I've never worked with any firm
18 that doesn't --
19          MR. MADUEGBUNA:  Note my
20     objection.
21     Let me object, Amy.  Okay?
22          THE WITNESS:  I'm sorry.
23          MR. MADUEGBUNA:  Just pause a
24     little bit.
25     A.   Okay.  Can you repeat the

Miller

1
2 question?
3     Q.   We can have it read back.
4     (Record read.)
5     A.   Okay.  I don't really understand
6 your question because to me if you're a
7 partner, you should have the terms of your
8 partnership in writing.  So that's the only
9 way I can answer that question.
10     Q.   But you knew you had the title
11 of partner without having a partnership
12 agreement at Levi & Korsinsky; isn't that
13 right?
14          MR. MADUEGBUNA:  Objection.
15     A.   That was exactly the problem,
16 that Ed promoted me to partner, and said he
17 would put the terms of my partnership
18 agreement in writing, that I would be paid
19 like Don and Nick.  He even told me that he
20 didn't let Nick starve when he wasn't
21 meeting the terms of his partnership
22 agreement.  He didn't go into the specifics
23 about how Nick didn't have any set
24 threshold, but then when I spoke to
25 Svetlana, she told me that Nick and Don

Miller

1
2 didn't have any threshold to earn any
3 commissions on their cases.
4     Q.   When did Nick start with the
5 firm?
6     A.   I don't recall.
7     Q.   Do you know how much business he
8 bought to the firm?
9     A.   I don't recall.
10     Q.   When did Don start with the
11 firm?
12     A.   I believe Don started in 2011.
13     Q.   Do you know how much business he
14 bought to the firm between 2011 and 2019?
15     A.   I don't know the specifics.
16     Q.   Do you know how profitable Don's
17 business was between 2011 and 2019?
18          MR. MADUEGBUNA:  Objection.
19     A.   All I know is I was working on
20 comparable cases and my cases were paying
21 comparable fees.
22     Q.   And what did you see as of
23 March 2019 that is your basis for making
24 that claim?
25          MR. MADUEGBUNA:  Objection.

Page 174

Miller

1            Miller
2    A.   I don't remember specifics, but
3  we all talked about what, you know,
4  securities cases were paying.  So that was
5  the general topic.  And everyone talked
6  about what M&A cases were paying among the
7  office.  And everyone knew that the kind of
8  cases that Don was bringing were not cases
9  that were paying millions of dollars in
10  fees.
11    Q.   What were the annual revenues of
12  Levi & Korsinsky in 2016 through '19, every
13  year?
14          MR. MADUEGBUNA:  Objection.
15    A.   I don't know.  The only thing I
16  know is Arthur told me that in 2017 I think
17  L&K made over a $9 million profit.
18    Q.   And what were the expenses of
19  Levi & Korsinsky every year between 2016 and
20  2019?
21          MR. MADUEGBUNA:  Objection.
22    A.   I was not specifically told that
23  information.
24    Q.   So you don't know anything about
25  the deal that Don had, do you?

Page 175

1            Miller
2    A.   All I know is what Svetlana told
3  me, and I've seen the document now that you
4  all produced.
5    Q.   When did Svetlana start at the
6  firm?
7    A.   Svetlana started a little bit
8  before I did.
9    Q.   How much did she earn?
10    A.   I don't know.  She didn't tell
11  me.
12    Q.   And based on what you saw
13  Svetlana doing, what kind of activity did
14  she have?
15    A.   What do you mean?
16    Q.   Well, she was an office
17  administrator, wasn't she?
18    A.   Yes.
19          MR. MADUEGBUNA:  Objection.
20    Q.   Thank you.  So is it fair --
21    A.   I mean, what do you mean by --
22  I mean, we haven't defined what "office
23  administrator" means.
24    Q.   Well, I asked you --
25    A.   Svetlana was in charge of

Page 176

1            Miller
2  payroll.  She was in charge of HR issues.
3  She was in charge of the paralegals.  It
4  seemed like the only thing that Svetlana was
5  not in charge of was the attorneys, except
6  for pay and HR, you know, issues like that.
7  But she wasn't like supervising attorneys.
8  She might have been supervising paralegals
9  and I think she was working on all like
10  financial stuff for the firm.
11    Q.   And when you say paying the
12  attorneys, it was the ministerial act of
13  having it recorded for the payroll company;
14  isn't that right?
15          MR. MADUEGBUNA:  Objection.
16    A.   I think she got like actual
17  e-mails because she told me how to draft
18  e-mails --
19          THE WITNESS:  Can you read back
20      the question, please.
21          (Record read.)
22    A.   I think it was more than that
23  because she told me how to write specific
24  letters when she was trying to help me, or
25  e-mails when she was trying to help me get

Page 177

1            Miller
2  the commission, and she showed me how the
3  other attorneys, like Don and Nick, had
4  written their e-mails to get their
5  commissions paid.  So I think she was a
6  little bit more involved than just, you
7  know, recording things for the payroll.
8    Q.   So I take it from that you
9  understand -- and incidentally, to whom were
10  these e-mails directed, from Don and --
11    A.   What do you mean?
12    Q.   From Don and Nick?
13    A.   Svetlana and I think Ariel, the
14  accounting person, was cc'd on them and they
15  went to Joe and Ed, I believe.
16    Q.   Because Joe and Ed own the firm
17  and they make the decisions, right?
18    A.   It was to inform them about the
19  cases.  I mean, I don't even know if they
20  were really even keeping track of what Don
21  and Nick were requesting because I saw
22  e-mails or something in their production
23  where I think Ed was saying I'm not even
24  keeping track of what commissions are being
25  paid, can somebody look into that.  So I'm

45 (Pages 174 - 177)

Page 178

Miller

1          Miller
2 not sure they were really looking into and
3 authorizing.  I think they were just paying
4 whatever the terms were that people were
5 requesting.  And I think even Nick was
6 asking for advances, and he was getting
7 advances when his cases weren't even paying.
8     Q.   Now, you're saying you've seen
9 some things in discovery in this case, but
10 you have a lawsuit that you filed and you
11 understand the obligations to file in good
12 faith?
13     A.   I absolutely filed in good
14 faith.
15     Q.   So we're going to have to pay
16 attention to that.
17          But you don't -- the reality is
18 you don't know anything about the deals that
19 were made, whether it was in 2011 or some
20 later date, with Don and Nick; isn't that
21 right?
22     A.   I did not know the specifics.
23 I only knew what Ed alluded to me when he
24 was talking to me about putting the terms of
25 my partnership agreement into writing, which

Page 179

Miller

1          Miller
2 he never did.
3     Q.   And -- but Ed did level with
4 you, and he said, let me make it clear to
5 you, your cases have to bring in more money
6 if you're going get paid any bonus or
7 commission, didn't he tell you that?
8     A.   No.
9          MR. MADUEGBUNA:  Objection.
10     A.   Ed told me --
11     Q.   Well, then why -- go ahead.  Go
12 ahead.
13     A.   He told me at the 2017 meeting
14 in December that as soon as my cases paid
15 money, that means bringing in fees, he said
16 nothing about needing P&Ls or anything
17 during the 2017 meeting.  He said that we
18 could put the terms in my partnership --
19 into writing.  And I specifically asked him,
20 does that mean I'm going to have to wait
21 until the end of the year to get paid or
22 will I get specific bonuses based on my
23 cases paying money, and he told me I would
24 get specific bonuses just like Don and Nick
25 got on theirs.

Page 180

Miller

1          Miller
2          And then when I went to approach
3 him in May of 2018, after my cases were
4 paying fees, he made discriminatory comments
5 to me, asked me if my husband was in the
6 room, and was putting it up to this, and
7 then he started treating me differently.
8     Q.   So why then, if that's true, did
9 you write on July 25th, 2018 to your brother
10 Alan -- write -- why then did you write on
11 July 25th, 2018 to your brother Alan that Ed
12 made it very clear to you that you need your
13 cases to bring in more money before you are
14 going to get paid any bonus or commission,
15 July 25, 2018?
16     A.   I don't remember exactly why I
17 wrote that.  I think I was -- you know, Ed
18 was -- at that point I think he had talked
19 to Joe and they had told me that my cases
20 needed to make at least like 2.5 million.
21 And that's why it was so critical, you know,
22 to settle the Patriot National case in
23 August because, you know, that would have
24 put me over the threshold.  And even if --
25 because -- and would have entitled to me

Page 181

Miller

1          Miller
2 money even under those terms, and that's
3 what -- exactly why I think Ed sabotaged the
4 deal because I was reaching the point
5 where -- you know, the level that he had
6 said that I had to meet, and so that is why
7 he sabotaged it.
8     Q.   I've heard you ascribe a motive
9 to Ed.  I've heard you talk about sabotage.
10 Let me -- a motive and I've heard you talk
11 about sabotage.  So let's talk about that
12 for a little bit.
13          Did Ed ever promise to give you
14 a hundred percent of the fee?
15     A.   Of the Patriot National fee?
16     Q.   Yes.
17     A.   No.  Why would he promise me a
18 hundred percent of the fee?
19     Q.   What percent do you think you
20 would have gotten?
21     A.   I don't know because I asked for
22 15 percent, so I was hoping I would get
23 something around 15 percent of whatever fee
24 came in.
25     Q.   That's a number you just made up

46 (Pages 178 - 181)

Miller

1          Miller
2  into Cohen Milstein to improve their
3  derivative practice.  They primarily focus
4  on securities cases, but they -- the
5  practice leader, Julie, has forayed into
6  some derivative lawsuits.  She's been
7  spectacular, so, you know, I think they're
8  starting to make a name for themselves.  You
9  know, Julie has had some settlements with
10 like Google for 300 million.  She settled
11 Wynn for 90 million.  So, yeah, we have
12 really good derivative cases now going on at
13 Cohen Milstein.
14     Q.   And if there was any reason why
15 the Amalgamated case could not go to Cohen
16 Milstein, is it fair to say that you had an
17 arrangement with Mark that you tried to get
18 it over to BLBG?
19     A.   Well, L&K wasn't going to be
20 representing Amalgamated without me being
21 there.  The client had made clear to me
22 that, you know, she wasn't comfortable with
23 L&K and she really wanted me to take the
24 case, because I was the one who was running
25 the case once I got fired.  And, you know,

1          Miller
2  you have -- Amalgamated has to be approved,
3  it has to be on this approved list before it
4  can use counsel.  So obviously Cohen
5  Milstein was on their approved list, but
6  there was a conflict.  So if there hadn't
7  been a conflict, then I would have taken the
8  McKesson case on behalf of Amalgamated to
9  Cohen Milstein.  But because there was a
10 conflict that arose, she had a preexisting
11 relationship with Mark and G&E, and they
12 were also in the case already, so it made
13 sense to, you know, transfer it to Mark, you
14 know, who they were comfortable with him
15 being counsel for them.
16     Q.   And you were comfortable with
17 that as well, weren't you?
18     A.   Well, Mark told me that he was
19 going to pay me for my time as a referral
20 and he specifically, you know, wanted me to
21 help look at the time records that L&K was
22 going to submit after I left because L&K has
23 a reputation for padding their time records,
24 and Mark is always talking about it to
25 everyone.  So he told me that he was going

1          Miller
2  to do that.  And then after I filed my
3  lawsuit and the case settled, and I thought
4  I was going to get paid by Mark, he said,
5  nope, I'm not paying you anything because
6  you're in litigation with Ed and I think Ed
7  might sue me if I pay you something.
8      Q.   So tell me about this deal with
9  Mark.  He -- what -- for what activity did
10 you think he would be paying you?
11     A.   I thought he would be paying me
12 for my work that I had already put in on my
13 time, but he thought it would be extra
14 helpful to have me look at the time records
15 that L&K was submitting after I left,
16 because I knew they were accurate before I
17 left because I was the one in charge of the
18 time and I was constantly telling Ed like,
19 you know, you didn't actually bill time on
20 this day, so I'm taking it out.
21     Q.   So let me understand that.  Do
22 you know how much time that -- so this is
23 the time up until March 28, 2019 that Mark
24 was going to pay you for; is that right?
25     A.   Yes.  And I think I had -- well,

1          Miller
2  I looked at what was submitted to the Court
3  and if it's accurate on my time, which I
4  don't even know anymore, I would have to
5  look at the time records and see if any were
6  made up.  It said I had over $500,000 in
7  lodestar in time.
8      Q.   So are you saying you expected
9  to receive from Mark $500,000?
10     A.   I expected to receive six
11 figures.  We talked about him giving me
12 something that was in the six figure range.
13 We didn't get into any more specifics.
14     Q.   Why not?
15     A.   Because there wasn't a
16 settlement yet.
17     Q.   No, but it was your time.  So
18 you're saying it's at least a hundred
19 thousand.  It may be as much as a half a
20 million; is that right?
21     A.   Um-hum.
22     Q.   Yes?
23     A.   Yes, that is correct.
24     Q.   So and this is for your time
25 worked up until March 28, 2019; is that

49 (Pages 190 - 193)

Miller

1
2 representation of McKesson for whom there
3 was a Cohen Milstein conflict?  Did you have
4 any discussion with Cohen Milstein about
5 that ethical and perhaps illegal
6 consideration?
7     A.   I don't understand your
8 question.
9     Q.   Well, we know you had a duty of
10 loyalty up until March 28, 2019 to Levi &
11 Korsinsky.  You were delayed from a May
12 start at Cohen Milstein until a July start
13 at Cohen Milstein because of a conflict
14 concerning McKesson; isn't that right?
15     A.   Yes.  I had to get a waiver from
16 McKesson.
17     Q.   Did the waiver say anything
18 about, oh, by the way, I am going to be paid
19 somewhere between a hundred thousand dollars
20 and half a million dollars for time I worked
21 when I was an employee owing a duty to Levi
22 & Korsinsky, and I'm going to get that money
23 while I'm employed by Cohen Milstein for
24 whom there was a waiver --
25     A.   I think you're mixing stuff up.

Miller

1
2 Like, I wasn't trying to get McKesson --
3     Q.   Mixing what up?
4     A.   Well, let me explain what I
5 think you're mixing up.  Like Mark was using
6 how much time I had put into the case as a
7 point of reference because he absolutely did
8 not want to pay me like 10 percent or even
9 5 percent for a referral fee for Amalgamated
10 because that probably would have been, you
11 know, millions of dollars.  So I think, you
12 know, you're trying to confuse things here.
13          I was trying to get a referral
14 fee for handing over the client and getting
15 paid for that.  I was not specifically
16 looking to get paid on my L&K time.  That
17 was just something that Mark used as a
18 reference.
19     Q.   That was your testimony, and we
20 will -- but we all know what the record will
21 say.
22          In fact, what you said isn't
23 true, is it, what you just said?
24     A.   It's how I remember it.
25     Q.   Well, that's now.

Miller

1
2     A.   Do you have a specific document
3 that you want to put in front of me?
4     Q.   Do you remember writing to
5 anybody that -- about Mark being very
6 appreciative about receiving the McKesson
7 case and saying that he would make very sure
8 that you got paid directly for your time on
9 the case, which is pretty much what your
10 testimony up until now has been?
11          MR. MADUEGBUNA:  Objection.
12     A.   Well, he used that as a time --
13 he used that as a reference, so that's how I
14 was referring to it.  But it was like the
15 referral fee that we were actually, you
16 know, trying to get some compensation for
17 that; although, Mark did say he would be
18 more than happy to pay me instead of L&K
19 because he really does not like L&K.
20     Q.   And you were annoyed when Mark
21 refused to pay you, weren't you?
22     A.   Oh, I was really mad, because I
23 felt like Mark went back on the deal, but
24 that wasn't surprising because that's, you
25 know, consistent with Mark.

Miller

1
2     Q.   Is the deal in writing?
3     A.   No.  Mark refused to put
4 anything in writing because he didn't want
5 it to be discoverable for Ed.
6     Q.   And what about the idea that he
7 didn't want it to be discoverable by an
8 ethics committee?
9          MR. MADUEGBUNA:  Objection.
10     A.   I don't think that had anything
11 to do with it.  He just was talking about
12 Ed.  We thought everything that we were
13 doing was completely ethical.
14     Q.   So when you were making this
15 deal, did you do anything to look at the
16 ethics of being paid for time that you
17 worked at Levi & Korsinsky?
18     A.   I wasn't getting paid for my
19 time.  I had nothing in writing.  Like it
20 was just like talk with Mark that he would
21 pay me something if Amalgamated went over
22 there.  We talked about how much time I had
23 put in there because, you know, Mark would
24 think like, oh, if I pay her a couple
25 thousand instead of that million or two that

51 (Pages 198 - 201)

Miller

1
2 she is looking for for her referral fee; you
3 know, Mark was trying to be cheap.
4       Q.   Well, let's be clear:  You were
5 getting 50 percent more working for Levi &
6 Korsinsky than you got when you went to
7 Cohen Milstein.  Your total pay in 2020 was
8 what, 193,000, less than 200,000; is that
9 right, at Cohen Milstein?
10           MR. MADUEGBUNA:  Objection.
11       A.   Yes, because the firm didn't
12 have a -- Cohen Milstein didn't have a good
13 year, so I didn't get the six figure bonus
14 that, you know, is -- what is usually paid
15 to of counsel.
16       Q.   Yes.  And they took 3 percent
17 off the top, instead of giving you 200,000,
18 they gave 193?
19       A.   I don't think that's true.
20       Q.   That's what your W-2 shows?
21       A.   I have no idea why that is.  I
22 don't think they gypped me.
23       Q.   Okay.  So you -- so the point
24 is:  You were getting $300,000 or so at Levi
25 & Korsinsky to work on the McKesson and

Miller

1
2 other cases and you got that $300,000,
3 right?
4           MR. MADUEGBUNA:  Objection.
5       A.   I was working without a contract
6 after I was promoted to partner and I was
7 told that my partnership terms would be put
8 into writing, that I would be paid like Don
9 and Nick.  Svetlana told me that they had no
10 threshold, even though then Ed then told me
11 that there would be a $2.5 million
12 threshold, and then he sabotaged me when it
13 looked like I would be able to settle the
14 Patriot National case with the client's
15 authority and bring in a fee that would put
16 me over that threshold.  And then they fired
17 me before I could bring in any other cases
18 that would make fees.
19           So I wasn't in a great position
20 when I accepted the offer at Cohen Milstein.
21 I had been fired.  I was going to
22 unemployment.  I had to take a job.
23       Q.   So let's -- you said a lot of
24 things.  Do you know if Don and Nick had a
25 threshold?

Miller

1
2       A.   I was told by Svetlana that they
3 did not, and their offer letters or their
4 terms of partnership agreement do not
5 refer to any threshold.
6       Q.   Do you know if Mr. Levi and
7 Mr. Korsinsky calculated what they would
8 receive based on their hitting a threshold?
9           MR. MADUEGBUNA:  Objection.
10       A.   I don't know.  All I know is
11 that Ed told me when Nick wasn't meeting the
12 terms of his partnership agreement he,
13 quote, didn't let Nick starve.
14       Q.   And how long had Nick been at
15 the firm?
16       A.   He didn't go into specifics.
17       Q.   How much money had Nick
18 generated for the firm for all the years he
19 had been at the firm?
20       A.   Ed and Joe never shared that
21 information with me.  If they had shared
22 that information with me, then we could have
23 had a discussion about specifics like this.
24 But they had decided that my request was so
25 offensive and that they were just going to

Miller

1
2 fire me.  And it seemed like gender
3 discrimination to me after the comments that
4 Ed made to me when I was requesting this
5 about my husband being in the room and
6 whether I needed him to negotiate for me.
7       Q.   But you weren't fired for
8 another ten months, were you?
9           MR. MADUEGBUNA:  Objection.
10       A.   Because I was such a great --
11           THE WITNESS:  Sorry.
12       A.   Because I was such a great
13 performer, and they were using me.  And they
14 lined me up and they used me to do arguments
15 in March, and then they fired me right
16 before all of my cases could have the
17 potential to settle, so then they didn't
18 have to have any more discussions with me.
19 Because by the end of the summer they told
20 me that they didn't want to have any
21 discussions with me, that I should just
22 focus on my cases.
23       Q.   So also given where you had
24 $500,000 of time, you think, in the McKesson
25 case, why -- what was left in the case for

Page 222

Miller

1          Miller
2  working on in 2011, not running a
3  derivatives department.
4      Q.   And it's fair to say you don't
5  know what Shannon's threshold is; is that
6  right?
7         MR. MADUEGBUNA:  Objection.
8      A.   I don't know if Shannon has a
9  threshold.
10      Q.   And you have no idea what her
11  profitability is; is that right?
12         MR. MADUEGBUNA:  Objection.
13      A.   Nobody ever shared that
14  information specifically with me.
15      Q.   And you mentioned also that --
16  again, about your husband's interest in how
17  much you earned.  In fact, Joe, your
18  husband, didn't like that you'd accepted the
19  Cohen Milstein offer when you accepted it;
20  isn't that right?
21         MR. MADUEGBUNA:  Objection.
22      A.   I mean, it was a big pay cut,
23  and I had another job offer that wasn't
24  formalized where I had -- when it looked
25  like the waiver wasn't going to come through

Page 223

1          Miller
2  for McKesson and I was getting extremely
3  desperate and it was very, very emotionally
4  distressing, I reached out to Steve Singer
5  at Saxena White, because he had approached
6  me when I first started working at L&K to
7  join Saxena White.
8        And Saxena White wanted to hire
9  me as their director of corporate
10  governance.  They were going to pay me
11  $285,000, but I didn't want -- and my
12  husband agreed.  We didn't want me to take
13  that higher paying job because it was in
14  Westchester, and it was important to me that
15  I could have work-life balance, and Steve
16  said that I would have to be in Westchester
17  four times a week, you know, because
18  everyone was commuting to be with him
19  because he lived up in Westchester.  And I
20  had also worked with Steve before when I was
21  at BLBG, and he did not have the best
22  reputation, despite him telling me that he
23  had changed his behavior.
24       So, you know, I had a higher
25  offer, but it -- to me I thought Cohen

Page 224

1          Miller
2  Milstein was going to be better for me in
3  the long run and I would, you know, be able
4  to make a lot of money there.  And I think I
5  will be making a lot of money there, much
6  more potentially than I'm going to be --
7  would have made at L&K.
8      Q.   And also let's be realistic, at
9  Levi & Korsinsky you were allowed to work at
10  home a ton of time.  Even though your
11  husband is a stay-at-home father and your
12  kids go to Poly nearby --
13         MR. MADUEGBUNA:  Objection.
14      Q.   -- you were able to work from
15  home a ton of time, weren't you?
16         MR. MADUEGBUNA:  Objection.
17      A.   Well, that was one of the issues
18  that I discussed with Ed when I was
19  interviewing about work-life balance and
20  whether I would be able to work from home
21  when I wanted to, and Ed told me he didn't
22  care where I was working as long as the work
23  got done.  So I was a professional, and when
24  I felt like I needed to be home, or if it
25  was easier for me to do work at home, I

Page 225

1          Miller
2  would work from home.  I would always get my
3  work done.
4       And it wasn't a problem at all
5  until I asked to be paid just like Don and
6  Nick and put my partnership terms in writing
7  in May 2018.  Then everything changed and
8  people started commenting about me working
9  from home.  Specifically, you know, Joe made
10  comments about that in my December 2018
11  review, which were unwarranted.
12       You know, I always got my work
13  done.  So I billed much more than the
14  160 hours that was required a month by L&K.
15  They shouldn't have had any complaints, and
16  they certainly didn't have any complaints
17  about other males working from home.  Mike
18  Rosner, he was a partner in the New York
19  office, he never worked in his office.  And
20  people just laughed about it.  Like Joe and
21  Ed were like, oh, he'll come in when he
22  comes in.  He might be working at that
23  Starbucks down the street, because his
24  office was like so disgusting.  Like I think
25  he really couldn't work in it, because after

Page 226

1            Miller
2 he left, it took days to clean it out and it
3 was just really disgusting from what I saw,
4 but --
5      Q.   You were --
6      A.   -- you know, and he also -- yes.
7      Q.   You wrote to Liz Nickless that
8 you were working from home a ton of time
9 with these wonderful guys who you were
10 working for; isn't that right?
11         MR. MADUEGBUNA:  Objection.
12     A.   What date was that?
13     Q.   I'm sorry?
14     A.   Can you tell me the date?  Would
15 you like to put that document in front of
16 me?
17     Q.   Well, do you remember ever
18 saying it to Liz Nickless?
19     A.   I'm sure I said it to a lot of
20 my friends, because before I asked to get
21 paid equally to Don and Nick and put my
22 partnership terms in writing, I was very
23 happy.  I was telling everyone how much I
24 loved L&K.
25     Q.   And did you ever make a proposal

Page 227

1            Miller
2 of new terms for your employment after May
3 of 2018 in the same way you sent the
4 proposals saying in 2016 here's the way I
5 want to be compensated?
6      A.   I was --
7         MR. MADUEGBUNA:  Objection.
8         THE WITNESS:  Sorry.
9         MR. MADUEGBUNA:  You can answer.
10 Go ahead.
11     A.   I was specifically asked to send
12 that document that I put together in 2016 by
13 Svetlana, and that's why I wrote it out.  I
14 was never asked to put terms of a
15 partnership proposal into writing and send
16 it to them.  In fact, I gave them a hard
17 copy document, and Ed said he had to talk to
18 Joe about P&L, then he never got back to me
19 about P&L.  He never had any discussions
20 about the proposal.  I wasn't expecting them
21 to say yes.  I was expecting us to have a
22 discussion, and that discussion never
23 happened.
24         MR. ROBERTS:  Sure.  We can take
25     a break now.

Page 228

1            Miller
2         THE VIDEOGRAPHER:  The time is
3 currently 3:42 p.m., and we are going
4 off the record.
5         (Recess.)
6         THE VIDEOGRAPHER:  The time is
7 currently 4:06 p.m. and we are back on
8 the record.
9      Q.   Ms. Miller, as a practicing
10 attorney you're familiar with principles of
11 document preservation; aren't you?
12     A.   Generally.
13     Q.   Well, what do you mean by that?
14     A.   I'm generally aware that if
15 somebody asserts litigation, then you have a
16 duty to preserve those documents, the
17 person, like the defendant.
18     Q.   And you're aware that that duty
19 applies to you as well in this litigation,
20 aren't you?
21     A.   I don't know if I'm specifically
22 aware of that, but, you know, you could put
23 the rule in front of me to refresh my
24 recollection.
25     Q.   So putting aside that you're an

Page 229

1            Miller
2 attorney, as a client have you never been
3 informed that in this case you have a
4 document preservation obligation?
5         MR. MADUEGBUNA:  Objection as to
6     the extent that this calls for any,
7     you know, attorney-client
8     communications.
9         If you can answer that without
10     revealing any confidences, please do
11     so.
12         MR. ROBERTS:  I don't think
13     there's anything about a privilege.
14         But go ahead.
15         MR. MADUEGBUNA:  You're asking
16     her what anybody has told her what her
17     duties or obligations are as a client.
18     That's attorney-client communication.
19     Q.   Are you --
20     A.   I don't think I can answer that
21 without revealing attorney-client privilege.
22     Q.   Okay.  Are you aware of any
23 obligation you have to not only preserve
24 documents, but be sure that they aren't
25 altered in any way by addition or deletion?

58 (Pages 226 - 229)

Page 270

```
1              Miller
2     A.   Not specifically, but it's there
3  in writing.
4     Q.   And Joe is your husband, right?
5     A.   Joe is -- my husband is named
6  Joe.
7     Q.   And that's the Joe you were
8  referring to when you write to Liz on
9  June 8th, 2019, right?
10        MR. MADUEGBUNA:  Objection.
11        (Record read.)
12    A.   I believe so, but I don't see
13 the document and I would like to see the
14 document.
15    Q.   Well, we're having trouble
16 uploading documents and I don't want to
17 waste time, but we'll try to get it for you.
18        Now, you also certified to a
19 prospective employer about the reason -- the
20 full and complete reason for your employment
21 termination, didn't you?
22    A.   I don't --
23        MR. MADUEGBUNA:  Objection.
24        THE WITNESS:  Sorry.
25    A.   I don't know what you're
```

Page 271

```
1              Miller
2  referring to.
3     Q.   Well, do you remember filling
4  out for Riley Safer Holmes & Cancila a
5  lateral candidate due diligence
6  questionnaire?
7     A.   Not specifically, but maybe I
8  filled it out.  Can you tell me the date?
9     Q.   It looks like it was March 31,
10 2019.
11    A.   Okay.  I would like to see the
12 document.
13    Q.   And this is a document we
14 received from you in your production, and
15 the question is:  Have you ever been
16 explicitly or implicitly -- ever been
17 explicitly or implicitly to leave a
18 partnership or legal or non-legal employer?
19 It's not a well written question, but that's
20 what it says.  And it says, If so, provide
21 details.  And here is your written response.
22 "Yes," is the answer, comma, "Ed Korsinsky
23 requested that I leave L&K on 3/28/19
24 because he believed I was looking for
25 another job and should focus my efforts on
```

Page 272

```
1              Miller
2  finding one."
3         Do you remember writing that as
4  your lateral candidate due diligence
5  questionnaire answer --
6         MR. MADUEGBUNA:  Objection.
7     Q.   -- for Riley Safer?
8         MR. MADUEGBUNA:  Objection.
9         You can answer.
10    A.   I don't specifically recall
11 writing that, but that is consistent with
12 what Ed told me as the reasons that he was
13 firing me when he fired me, so I was just
14 stating what Ed had told me.
15    Q.   Well, but that's -- but you have
16 to look at the question, and let's look at
17 it.
18    A.   Well, I can't see it.  It would
19 be really a lot helpful.  I know you're
20 having technical difficulties, but it's
21 really unfair to me to not be able to see
22 the documents.  As somebody who's been --
23 you know, done a lot of depos, I always give
24 the client, you know, the person who's being
25 deposed, a copy of the document.
```

Page 273

```
1              Miller
2         (Defendants' Exhibit 14, nine
3         pages, Riley Safer Holmes & Cancila
4         LLP Lateral Candidate Due Diligence
5         Questionnaire, dated 3/31/2019, Bates
6         stamp PLF ESI 0001401 to '1409, marked
7         for identification, as of this date.)
8     Q.   Now, the question is on page 4.
9  This isn't me asking the question, this is
10 Riley Safer asking you in their due
11 diligence questionnaire a question.  So why
12 don't you read the question out loud.
13    A.   Okay.  "Have you ever been
14 explicitly or implicitly to leave a
15 partnership or legal or non-legal employer?
16 If so, provide full details."
17 "Yes, Ed Korsinsky requested
18 that I leave L&K on 3/28/19 because he
19 believed that I was looking for another job
20 and should focus my efforts on finding one."
21 I believe that is consistent with what Ed
22 said to me, and I think that answers the
23 question.
24    Q.   Now, you were asked -- you
25 weren't asked in this question what you
```

69 (Pages 270 - 273)

Page 282

Miller

1
2 I know how to do a substitution of counsel
3 and that Amalgamated wanted to substitute
4 counsel as soon I was fired.  But, you know,
5 I didn't have a job, so I had to go get one.
6     Q.    And -- and when the Amalgamated
7 case did transfer, you weren't the lawyer on
8 the case, were you?
9     A.    We've already been over this.  I
10 could not take the case to Cohen Milstein
11 because there was a conflict.
12     Q.    Good.  Okay.  Thank you very
13 much.
14          And you understood that Levi &
15 Korsinsky and the clients had a right and a
16 responsibility to protect confidential
17 client information, right?
18          MR. MADUEGBUNA:  Objection.
19     A.    Yeah.
20     Q.    That's a yes, right?
21     A.    Yes.
22     Q.    And you understand that that's a
23 professional and ethical responsibility of
24 lawyers to protect client confidential
25 information, right?

Page 283

Miller

1
2          MR. MADUEGBUNA:  Objection as to
3 form.
4     A.    Yes.  I feel like we've already
5 been over this too.
6     Q.    Okay.  And you understood that
7 client information couldn't be removed by
8 you from Levi & Korsinsky once your
9 employment ended; didn't you?
10     A.    I'm not sure what you mean by
11 "client information."
12     Q.    Why not?
13     A.    Well, I mean, I think there's a
14 difference between like e-mails and things
15 like that and the confidential client
16 information.
17     Q.    You tell me what you think the
18 distinction is between those two things.
19     A.    I think you're not allowed to
20 take like confidential like work product and
21 things like that.  I don't think there's any
22 problem if you write down somebody's name
23 and phone number, so if you want to call
24 them in the future and say, hey, I'm at this
25 firm, you know, you have that information to

Page 284

Miller

1
2 say hello to people who you worked with.
3     Q.    Okay.  But in general you do
4 understand and accept that information could
5 not be removed from Levi & Korsinsky's
6 premises if it pertained to clients, right?
7     A.    If it was confidential client
8 information, yeah.  I mean, if it pertained
9 to a case, absolutely.  I didn't take
10 anything that pertained to a case with me.
11     Q.    And the same thing holds for the
12 fact that you couldn't remove things
13 concerning clients or their affairs from the
14 Levi & Korsinsky systems; isn't that right?
15          MR. MADUEGBUNA:  Hold on.
16          Objection.
17     A.    Yes.
18     Q.    And you understood that that's
19 not only a professional and ethical
20 responsibility, but it's also consistent
21 with the acknowledgment you signed of Levi &
22 Korsinsky's e-mail, Internet and voice-mail
23 policy; isn't that right?
24          MR. MADUEGBUNA:  Objection.
25     A.    I don't remember specifically.

Page 285

Miller

1
2 If you want to show me the document, you
3 can.
4     Q.    And while that's happening,
5 understanding all of that, you took Levi &
6 Korsinsky client documents, didn't you,
7 after you knew your employment was
8 terminated?
9     A.    No, I'm not aware of any Levi &
10 Korsinsky confidential client documents that
11 I took.  If you want to give me an example,
12 I'd like to know.
13     Q.    Let's try it this way:  How much
14 time did you spend on the evening of
15 March 28, 2019 taking -- sending documents
16 to your personal e-mail account?
17     A.    Yeah.  I sent a lot of documents
18 to my personal e-mail account because I
19 thought I had a gender discrimination
20 lawsuit against Ed and Joe.  So the only
21 documents that I was forwarding to myself
22 were documents that I thought would support
23 my lawsuit.
24     Q.    So you're saying that what you
25 thought you had about a gender

72 (Pages 282 - 285)

Page 286

Miller

1  discrimination lawsuit mattered more to you
2  than your ethical responsibilities, your
3  professional responsibilities and your
4  commitment by way of a certification that
5  you would not take certain documents,
6  so you're -- is that what you're saying?  Is
7  that what you're saying?
8      MR. MADUEGBUNA:  Objection.
9  A.   I did not take any documents
10  that were client confidential documents.  I
11  took, you know, charts that I had created
12  showing how I had put together, you know, my
13  docket and how much things were worth.  I
14  took e-mails where my cocounsel were
15  complimenting me on the great jobs I was
16  doing.  You know, I wasn't sure that a
17  severance agreement was going to work out
18  with Ed and Joe based on our prior dealings
19  where things hadn't worked out, so I was
20  getting ready to potentially sue them.
21      I had told Debbie the full truth
22  about how I had been treated at the end of
23  January.  She thought it was horrible, and
24  she had given me the name of a

Page 287

Miller

1  discrimination lawyer who, you know, I put
2  off calling until after I was fired.
3      But, you know, everyone who I
4  told the truth about what specifically
5  happened to me and how Ed made comments to
6  me when I asked to get paid about whether my
7  husband was in the room and whether he
8  wanted to negotiate and how Joe said no,
9  Shannon never would have said that because
10  she knows her place.  You know, I told her
11  about that, and she thought it was horrible.
12      And she, you know, was
13  completely supportive of me leaving L&K
14  after I told her that information and
15  provided me with the name of an attorney,
16  because she told me that there were a lot of
17  bad employment attorneys out there and you
18  had to make sure you got a good one.
19  Q.   And did you tell Debbie that
20  your husband Joe was a very active and
21  prominent presence in your affairs with Levi
22  & Korsinsky because he wasn't a salary or
23  wage earner, and because you were investing
24  your income not only in your children and

Page 288

Miller

1  your husband and how you lived, but also in
2  the real estate, and that he did weigh in,
3  and even weighed in on Cohen Milstein, about
4  whether or not your compensation was
5  appropriate.  Did you tell her that?
6      MR. MADUEGBUNA:  Objection.
7  Q.   Did you tell Debbie that?
8  A.   No, I didn't go into the
9  personal discussions that I have with my
10  husband about how I'll be paid.  I mean, I
11  would expect all husbands and wives to talk
12  about those issues, and my husband and I had
13  some disagreements on those issues.
14  Q.   How did you select the documents
15  that you were going to remove from Levi &
16  Korsinsky's files and send to yourself?
17  A.   As I told you, I picked
18  documents that I thought would support my
19  gender discrimination claims, so they were
20  basically looking at all of my work product
21  and the value of my cases and the way
22  that -- yeah.
23  Q.   Your work product.  What does
24  that mean?

Page 289

Miller

1  A.   Like I told you, examples of
2  people complimenting my work.
3  Q.   What about -- and the work that
4  you did and the conversations that you had
5  and the representation you supplied in your
6  professional capacity, confidentially on
7  behalf of clients, right?
8      MR. MADUEGBUNA:  Objection.
9  A.   No.
10  Q.   How many pages did you send to
11  yourself?
12  A.   I have no idea.
13  Q.   How much time did you devote to
14  doing it?
15  A.   What?
16  Q.   How much time did you spend
17  doing it?
18  A.   It was like a couple of hours
19  maybe.
20  Q.   And what files, what sort of --
21  what sort of files did you access to make
22  your selections?
23  A.   I don't think I accessed
24  anything except for e-mails, because I was

73 (Pages 286 - 289)

Miller

1        Miller
2   mainly looking for e-mails that had all of
3   my charts and all of the status reports and
4   things that I had sent to Ed and Joe,
5   especially because they had documentation
6   about how I had asked for commissions to be
7   paid once my cases started paying fees.
8        Q.   So tell me something:  What's a
9   status report?
10       A.   A status report?
11       Q.   Yeah.  You said you took status
12  reports.  What's a status report?
13       A.   That was like the work that I
14  was doing that had no confidential client
15  information.
16       Q.   Tell me -- no.  Tell me what the
17  contents of your status reports were.
18       A.   They were work that I was
19  working on.
20       Q.   And what did you say about the
21  work you were doing, or the things you were
22  working on?  What --
23           (Record read.)
24           THE WITNESS:  I think that's
25       correct.

1        Miller
2        Q.   The work you were working on as
3   an attorney employed by Levi & Korsinsky to
4   represent Levi & Korsinsky clients; is that
5   right?
6        A.   I mean, we can look at a status
7   report.  Why don't we look at a status
8   report and you can try to like, you know,
9   categorize it.  I mean, why don't you pull
10  it up?  I've tried to describe what's in
11  there.  I think you can look at the document
12  and see what's in there.
13       Q.   Before you removed any of these
14  documents and sent them to yourself, did you
15  do anything to review bar, ethical or
16  disciplinary rules before you sent these
17  things to yourself?
18           MR. MADUEGBUNA:  Objection.
19       A.   No.
20       Q.   And, by the way, you knew that
21  once your employment ended you didn't have
22  any right to even access this information,
23  because you were no longer someone with
24  employee status with the firm; isn't that
25  right?  You knew what you were doing was

1        Miller
2   wrong?
3           MR. MADUEGBUNA:  Objection.
4        A.   I don't think what I was doing
5   was wrong.  I think I was preserving
6   evidence for a lawsuit that I was entitled
7   to bring.
8        Q.   Well, you've been around for a
9   long time.  Have you ever said to an
10  adversary or written even to a party and
11  said you have a preservation obligation that
12  you must abide by?  Have you ever done that?
13          MR. MADUEGBUNA:  Objection.
14       A.   I can't remember specifically
15  doing that, but maybe.
16       Q.   Well, in your practice -- and I
17  know it didn't happen in this case from your
18  prior testimony, but are you aware that law
19  firms issue documents or -- either law firms
20  do it or clients themselves do it -- impose
21  preservation responsibilities?
22       A.   I'm aware that when a lawsuit
23  has been filed, generally, you know, a memo
24  goes out or something like preserve these
25  documents.

1        Miller
2        Q.   And, in fact, are you aware
3   whether your current law firm gave that same
4   preservation notice to Mr. Levi and
5   Mr. Korsinsky and the firm?
6        A.   What?
7           MR. MADUEGBUNA:  Objection.
8        Q.   Do you know if anything was ever
9   written by the law firm that's currently
10  representing you to indicate that there is
11  a -- that there's an expectation that
12  documents will be preserved?
13       A.   Well, I think you're asking me
14  this again, and I am not going to testify to
15  what my attorneys told me.
16       Q.   I didn't ask you that, but
17  that's okay.
18           MR. MADUEGBUNA:  Objection.  It
19       sounds like what you were asking,
20       Mr. Roberts.
21       Q.   Instead of writing to Mr. Levi
22  and Korsinsky and saying to them on the
23  evening of March 28, 2019 I expect you to
24  preserve all these documents because I may
25  have a gender discrimination case against

Miller
2 you, you did something else; isn't that
3 right?
4         MR. MADUEGBUNA: Objection.
5     A.   Yes, I forwarded documents to
6 myself, yes, to preserve them so I made sure
7 that I had them.  And I think that was
8 actually very helpful, because when you all
9 produced documents originally, you had
10 inappropriate redactions on those documents.
11    Q.   So you had a choice.  You could
12 write a one- or two-sentence letter to Ed
13 and Joe saying preserve my documents because
14 I may have a claim against you.  But instead
15 of doing that you spent at least a couple of
16 hours going into the Levi & Korsinsky
17 system, for which you had no authority to
18 have access, and you took documents that
19 you, as I understand your testimony, thought
20 would be helpful to your gender
21 discrimination case; is that correct?  Is
22 that what you're saying?
23        MR. MADUEGBUNA: Objection.
24    A.   Sorry, can you read that back?
25        (Record read.)

Miller
2     A.   Okay.  Well, you asked me if I
3 had a choice.  I don't think I had a choice
4 to write Ed and Joe that I was going to like
5 preserve the documents, I'm going to assert
6 a gender discrimination case against you.  I
7 mean, I was trying to also work out a
8 severance agreement.  They told me that they
9 were going to provide me with a severance
10 agreement, so this was like insurance for if
11 the severance agreement didn't work out.
12    Q.   And in addition to not
13 consulting or conferring -- or referring to
14 any ethical or disciplinary rules, what did
15 you do to get client permission to access
16 these documents and transfer them to your
17 personal -- personal control?
18        MR. MADUEGBUNA: Okay.
19 Objection.
20    Q.   What, if anything, did you do
21 to reach out to clients about that?
22        MR. MADUEGBUNA: Objection.
23    A.   I don't recall taking any client
24 information that I would need to reach out
25 to clients.  I mean, the only client who I

Miller
2 was having discussions with continuously was
3 Debbie at Amalgamated, because she really
4 wanted the case to go wherever I landed
5 after I got fired.
6     Q.   Yes, but you've testified it was
7 months later before she gave any
8 authorization, and the authorization didn't
9 go to you, it went to BLBG and it went to
10 G&E, right?
11    A.   Yes.  And I've also testified
12 how it took months to get a waiver from
13 McKesson, and during that time period I was
14 interviewing at other firms because I had
15 obligations to do so with the employment
16 office.  And, you know, so Debbie -- I mean,
17 I assume, I was told that L&K continued
18 representing Debbie and that Will even went
19 to the mediation in April.  And then after
20 that the co-leads told them that they
21 couldn't send anybody anymore.
22    Q.   Exactly.  That's my point.
23 Thank you for making it.
24    A.   Yes, because they didn't feel
25 that L&K was adding any value.

Miller
2     Q.   But they were counsel of record
3 and the only authorized custodian and party
4 to access client information at Levi &
5 Korsinsky; isn't that right?
6     A.   That's true.
7         MR. MADUEGBUNA: Objection.
8     A.   But they weren't co-lead counsel
9 in the case.  So whether they were allowed
10 to come to the mediation or not was being
11 decided by the co-leads in that case.
12    Q.   Now, since you took these
13 documents that you spent at least a couple
14 of hours downloading, transferring, where
15 have you -- where have they been placed?
16 Where are they?
17    A.   What do you mean?
18    Q.   Well, you sent these documents
19 to yourself; is that right?
20    A.   So they went to my e-mail.
21    Q.   And what have you done to secure
22 these documents since they went to your
23 e-mail?
24    A.   My e-mail is protected by a
25 password.

75 (Pages 294 - 297)

Page 298

```
1              Miller
2         MR. MADUEGBUNA:  Objection.
3     Q.   That's all?
4     A.   I mean, these documents, to my
5  knowledge, don't include any confidential
6  client information.  They were documents
7  that I wanted to have to support my gender
8  discrimination lawsuit, so yeah, I think
9  they're safe in my e-mail.
10     Q.   Now, in your complaint, which
11  runs for a very long time, how many of these
12  documents do you refer to in your complaint?
13         MR. MADUEGBUNA:  Objection.
14     A.   I can't recall.  I mean, I'm not
15  sure what you mean.  Like, I'd have to look
16  at my complaint, and I don't recall anything
17  being referred to specifically, but I don't
18  know, you know, what you're talking about
19  really.
20     Q.   So you have 166 paragraphs in
21  your complaint.
22     A.   Um-hum.
23     Q.   Are you saying that none of
24  those hundred and 66 paragraphs relate to
25  the documents you spent more than two hours,
```

Page 299

```
1              Miller
2  according to your testimony, taking from the
3  Levi & Korsinsky systems on March 28, 2019
4  after your employment was ended?
5         MR. MADUEGBUNA:  Objection.
6     A.   Well, I thought you asked me if
7  I referenced any of those documents in the
8  complaint; was that not your question?
9     Q.   That is my question.
10     A.   Because now -- I did not -- I
11  don't think I specifically referenced, but
12  all of those documents, you know, support
13  claims in my complaint.
14     Q.   Now, apart from not asking for
15  permission from clients, what, if anything,
16  did you do after you took these things to
17  notify clients, whose names or information
18  appears in what you took -- to notify those
19  clients that you have that information
20  somewhere on your iPhone secured by nothing
21  more than a password?
22         MR. MADUEGBUNA:  Objection.
23     A.   I don't have -- I don't know
24  what you're talking about.  I didn't take
25  any client information that I would have to
```

Page 300

```
1              Miller
2  disclose to them that I took it.  I don't
3  understand.  I took some e-mail addresses
4  and some phone numbers, and if I decided
5  that I wanted to e-mail them or reconnect
6  after I landed at my new job, then I
7  connected.
8     Q.   So it's your testimony that
9  you -- nothing you took has anything to do
10  with a client matter, it's e-mail addresses
11  and it's contact information and it's --
12  but there's no -- nothing about the
13  representation and the rights of a client in
14  anything you transferred to yourself from
15  the Levi & Korsinsky system on March 28,
16  2019; is that the testimony you're giving
17  under oath now?
18         MR. MADUEGBUNA:  Objection.
19     A.   My testimony is I don't recall
20  there being anything confidential about a
21  case, about a client that I took.  And I
22  certainly didn't take it for any purpose
23  other than pursuing gender discrimination
24  claims against L&K.
25     Q.   But don't you think there is a
```

Page 301

```
1              Miller
2  superior purpose, like ethical
3  considerations, disciplinary rules
4  protecting the integrity of client
5  information, fulfilling your obligation as a
6  professional attorney to your employer, your
7  former employer that is a law firm, in its
8  own right responsible for protecting client
9  information?
10         MR. MADUEGBUNA:  Objection.
11     A.   I feel like you keep on asking
12  the same question over and over again, and
13  I've already answered this.  I -- you know,
14  if you have something specific that you
15  think that I took that I shouldn't have
16  taken, please show it to me and then I can
17  explain whatever it is.  But sitting here
18  right now, I don't know what you're talking
19  about, and it just seems like you're trying
20  to trap me.
21     Q.   What did you do to say to either
22  Ed Korsinsky or Joe Levi, I entered the
23  system last night and for more than two
24  hours I looked at documents, and some of
25  those documents that I looked at -- several
```

76 (Pages 298 - 301)

Page 302

Miller

1
2 of those documents and maybe hundreds of
3 those documents I transferred to my personal
4 e-mail; what did you do to tell them that?
5        MR. MADUEGBUNA:  Objection.
6    Counsel, you know, I've given you a
7    lot of leeway, you know, and you keep
8    to continue going south.  It's not my
9    role to stop you from asking
10    questions, but you're asking the same
11    questions over and over and over again
12    and you're just complaining about
13    wasting time.  So let's move on.
14        MR. ROBERTS:  This question has
15    not been asked before.  My question is
16    different from anything asked before.
17        MR. MADUEGBUNA:  What's
18    different?  You're harassing.  This is
19    now harassment and badgering, and
20    under the rules I can speak too and --
21    stop, stop for one second.
22    Q.  What did you do --
23        MR. MADUEGBUNA:  Mr. Roberts,
24    stop.  You've got to stop and listen
25    to me.  You cannot keep doing this.

Page 303

Miller

1
2    When one lawyer is speaking, you
3    listen.  You don't just ignore me and
4    keep talking.
5        Under the rules you cannot
6    harass a witness.  You've asked this
7    question for the past, what,
8    25 minutes, over and over in every
9    shape or form, and I've allowed you to
10    do that.  At some point it has to come
11    to an end.  So I'm going to allow a
12    little bit of a leeway, and that's it.
13    So, please.
14    Q.  What did you do to notify Joe
15 and Ed that you, after knowing you were
16 fired, you -- you entered the Levi &
17 Korsinsky electronic system, looked at
18 documents, made selections among those
19 documents and transferred those Levi &
20 Korsinsky documents to your personal e-mail?
21        MR. MADUEGBUNA:  Objection.
22    Q.  What did you do --
23        MR. MADUEGBUNA:  Objection,
24    asked and answered in multiple
25    different ways.

Page 304

Miller

1
2        MR. ROBERTS:  It's not been
3    answered.  It has not been answered.
4        MR. MADUEGBUNA:  It has.
5    Q.  What did you do to notify them
6 after the fact, after the fact, what did you
7 do to notify them that you had done this?
8        MR. MADUEGBUNA:  Note my
9    objection.
10        You can answer the question.
11    A.  I did not notify them.
12    Q.  Now, since you've had these
13 documents, how many -- which of those
14 documents have you sent anywhere other than
15 the place where you sent them on March 28,
16 2019, any of the documents?
17    A.  Only to my attorneys.
18        MR. MADUEGBUNA:  Objection.
19        THE WITNESS:  Sorry.
20    A.  Only to my attorneys and my -- I
21 think I'm allowed to say that.
22    Q.  We will take a look at
23 Exhibit 15.
24        MR. CLARK:  Yes.
25        (Defendants' Exhibit 15, one

Page 305

Miller

1
2    page, Levi & Korsinsky Acknowledgment
3    of E-mail/Internet/Voice-Mail Policy,
4    dated July 2014, signed 8/15/2016,
5    Bates stamp L&K 000006, marked for
6    identification, as of this date.)
7    Q.  Do you recognize this document?
8    A.  Vaguely.
9    Q.  I'm sorry?
10    A.  I said, "vaguely."
11    Q.  Okay.  Do you recognize your
12 signature in two places?
13    A.  I see my signature under my
14 name --
15        MR. MADUEGBUNA:  Objection.
16    A.  -- yes.
17    Q.  And it's your handwriting for
18 both your name and your signature; is that
19 right?
20    A.  Yes.
21    Q.  Okay.  So let's look at your
22 complaint, or the allegations of your
23 complaint.  To the extent you're complaining
24 about compensation, I think we've
25 established, but I just want to confirm, you

77 (Pages 302 - 305)

Page 314

Miller

1 Miller
2 I don't think it really matters if you say
3 bonus or commission. Like I was calling
4 what I thought I should get from L&K a
5 bonus, and Svetlana told me, no, I should
6 call it a commission. So I'm trying -- you
7 know, I think of commission and bonus as the
8 same term.
9     Q.   In your complaint you asked for
10 certain damages and you've articulated your
11 damages in a number of ways; sometimes you
12 say you want 15 percent of the fees on cases
13 you lined up for settlement. Do you
14 remember saying that in your pilot
15 discovery -- pilot discovery protocols and
16 interrogatories?
17     A.   No. I -- if you want to show me
18 the document, please show me the document.
19 I don't just remember what are in these
20 documents that are 25, 30, 50 pages long.
21     Q.   In your responses to
22 interrogatories you say you want between
23 1.234 million and 2.008 million representing
24 15 percent of fees on plaintiffs' cases
25 lined up for lucrative settlements that L&K

Page 315

1 Miller
2 did not pay; do you remember saying that?
3     A.   No. If you want to show me the
4 document, perhaps I'll remember.
5     Q.   Well, when you had to respond to
6 the interrogatories, which you verified, on
7 what basis did you -- on what basis did you
8 do those calculations?
9     A.   I did those calculations based
10 on probably using the charts that I had
11 created because they gave me a general
12 guideline as to how I was thinking. And
13 then I -- some of them I did additional
14 research and found information that was
15 public related to it and made estimates
16 based on that. And others I made estimates
17 based on my best estimate.
18     Q.   So 15 percent of fees is what
19 you're asking for?
20     A.   Yes.
21     Q.   Is that right?
22     A.   I believe so. I mean, if you
23 want to show me the document, I could
24 confirm what you're trying to say, but, you
25 know.

Page 316

1 Miller
2     Q.   Do you know anybody at Levi &
3 Korsinsky who gets 15 percent of fees
4 without regard to threshold, without regard
5 to profitability; do you know anybody who
6 gets that?
7     MR. MADUEGBUNA:  Objection.
8     A.   What everyone disclosed and what
9 people got was not disclosed to me.
10 Svetlana helped me put together that
11 proposal. That was a proposal. I didn't
12 expect Ed and Joe to say yes. I expected
13 that there was going to be a negotiation
14 related to the proposal that I presented,
15 but Joe told me that -- I mean, Ed told me
16 that he had to go talk to Joe about P&L, and
17 then later they threw out that, you know,
18 they hadn't gotten back to me on the P&L
19 numbers, but Ed said something about, you
20 know, how you had to have enough money, I
21 think he might have said, the $2.5 million
22 threshold, which was consistent with that
23 offer letter, but nobody had any specific
24 discussions with me. Instead of giving me
25 P&L numbers and coming back and actually

Page 317

1 Miller
2 putting the terms of my partnership
3 agreement in writing, I was told that they
4 weren't going to do that and that I should
5 just focus on my work. And that probably --
6 that occurred several months later. So I
7 was waiting, you know, for them to come back
8 to me and negotiate this. And I was very
9 disappointed when they told me that, you
10 know, they weren't even going to talk to me
11 about this after Ed had promised that we
12 were going to put the terms of my
13 partnership agreement into writing once my
14 cases started paying money in 2018. And I
15 remember specifically asking him about that
16 because it was important to me that I didn't
17 have to wait until the end of the year to
18 get a year-end bonus, that I would start
19 getting that money right away.
20     I'm not even sure if I expected
21 to get a year-end bonus if I had been paid
22 commissions, you know.
23     Q.   So setting aside that you filed
24 your complaint in February of 2020, less
25 than three months ago on November 2, 2021,

80 (Pages 314 - 317)

Errata Sheet for Amy Miller's January 24, 2022 Deposition

36:11: change "fraught" to "brought"

38:7: change "derivatives" to "derivative"

43:6: insert "board" before "and"

43:7: insert "board" before "to"

63:5: change "Kelley" to "Lebovitch"

78:2: insert "&A" before "cases"

83:9: change "deserve" to "deserved"

89:20: change "their" to "our"

112:22: change "that" to "things"

115:10: delete "as"

117:23: change "Matt" to "Max"

118:3: change "meeting" to "mediation"

123:17: change "expected" to "expect"

127:10: change "say" to "later"

137:19: add "in" after "partnership" and change "write" to "writing"

141:11: change "you" to "L&K"

142:15: delete "me" and add "a business plan" after "up"

142:24: add "to a defense firm" after "go"

144:8: change "coast" to "country"

144:10-11: delete "spending out with my family"

148:12: change "discussing" to "discussions"

149:16: change "interest" to "interests"

152:8: change "them" to "him"

158:12: change "always" to "also"

159:20: change "on" to "of"

162:15: change "week" to "year"

177:13: change "Ariel" to "Yariela"

179:18: change "could" to "would" and change "in" to "of"

185:19: change "Eileen" to "Aielleen"

186:24: add "assistant" before "general"

191:2: delete "be" and change "approved" to "approve"

191:3: change first "it" to "a firm" and change second "it" to "Amalgamated"

210:6: change "thing" to "settlement"

241:10: add "building' before "my"

244:15: change "There" to "It"

245:15: change "went" to "wanted"

260:2: add "not" before "honest"

267:19: change "McIntosh" to "Macintosh"

272:12: change "reasons" to "reason"

296:15: change "employment" to "unemployment"

311:2-3: change "I'm going to comply" to "Cohen Milstein complies"

311:18: change "dollars" to "dollar"

311:21: change "come" to "came"

313:10: delete "is"

313:11: change "paid" to "pays" and add "then" after "I"

326:20: change "don't" to "didn't"

_____

Amy Miller

Subscribed and sworn to before me

this ⎿5ᵀᴴ day of April, 2022

_____

Notary Public

SAMUEL O. MADUEGBUNA
Notary Public, State of New York
Reg. No. 02MA50471194
Qualified in Westchester County
Commission Expires October 25, ___ 2025